**The STATE of Iowa, Appellee,**

v.

**Edward Joseph WEDELSTEDT, Appellant.**

**No. 60762.**

Supreme Court of Iowa.

March 22, 1978.

Rehearing Denied May 17, 1978.
See 265 N.W.2d 626.

C. A. Frerichs, of Fulton, Frerichs, Nutting & Martin, Waterloo, for appellant.

Richard C. Turner, Atty. Gen., Thomas A. Evans, Jr., Asst. Atty. Gen., and David H. Correll, County Atty., for appellee.

Considered by REYNOLDSON, Acting Chief Justice, and LeGRAND, REES, HARRIS, and McCORMICK, JJ.

HARRIS, Justice.

Defendant appeals his convictions of aiding in concealing stolen goods in violation of § 712.1, The Code, 1973, and of conspiracy in violation of § 719.1, The Code, 1973. We affirm the trial court.

A central figure in the State's case was Thomas Meade. The record shows that, in 1967, Meade was incarcerated upon conviction of a felony. After his release he went to college and then to work for Edward Joseph Wedelstedt (defendant). Defendant was shown to own a chain of what were characterized as bookstores. Meade found locations and opened new bookstores for defendant.

In 1974, while in Davenport visiting his parents, Meade met some people who had stolen two movie projectors. He thereafter called defendant at his office in Cedar Rapids, Linn County, Iowa, to inquire whether defendant wanted to buy the stolen projectors. Defendant agreed to purchase the projectors for $200. After the purchase was made Meade told defendant the people who stole the projectors also saw several canisters of film located at the farmhouse where the projectors were stolen. Believing the films were pornographic and thus useful in his business, defendant sent Meade back to investigate the films. Meade went to the Davenport farmhouse, stole a few canisters, and took them to his sister's farm near Davenport. The following day Meade met defendant at a truckstop and showed the stolen samples. Although the films were not pornographic, defendant was interested in buying them.

The day following this meeting Meade drove his station wagon back to the farmhouse and loaded it by stealing more film. Because there were so many films Meade went back the next day with a rented truck and with help. The truck was loaded with films and various furniture. The truck was then driven to Meade's home in Solon, Iowa, where the stolen furniture was unloaded. Thereafter Meade's wife drove the station wagon to defendant's warehouse in Cedar Rapids. Defendant and his helper followed in the truck.

Defendant paid $10,000 for the stolen films, $2500 in cash and $7500 in credit on a mortgage defendant held on Meade's house in Solon.

Defendant then gave Meade $200 and directed him to rent a trailer and to buy foot lockers so the films could be taken from the truck and hauled to another place for storage. Meade did so and thereafter drove the trailer to defendant's home in Cedar Rapids and left it there so that someone else could move the films for storage at a place unknown to Meade.

In October of 1974 the State filed criminal charges against Meade in an unrelated matter. Motivated by desire to escape punishment in that matter Meade entered into an agreement with the State. Meade received limited immunity in exchange for his furnishing evidence against defendant. From this point Meade worked in a dual capacity. Defendant believed Meade remained his agent and was acting in his behalf. At the same time Meade worked with the Iowa bureau of criminal investigation (BCI). He wore a transmitter to record conversations with defendant. Several recorded telephone conversations between Meade and defendant were received in evidence. One such conversation had to do with a book found by Meade and later given defendant which listed all the films. Another conversation concerned finding a more permanent storage place for the films. Other conversations dealt with finding someone who would buy the stolen films.

At the direction of the BCI Meade told defendant that a prospective buyer from Los Angeles had been found for the films. This was done at defendant's office in Cedar Rapids on November 7, 1974.

By December 12, 1974, after several other conversations, principally in Cedar Rapids,

defendant told Meade of another potential buyer named Erlich. As it turned out Erlich did not want the films. Meade reported all this to the BCI. Fearing defendant might sell the films to some other buyer the BCI decided to arrange an offer to purchase the films.

On December 12, 1974, defendant took a plane to Las Vegas, Nevada. Meade called defendant there and told him he wanted the $7500 in cash because he had not received credit on his house mortgage. In the course of this conversation defendant told Meade that, if Meade would sell the films for him, he (defendant) would split the profits 50–50. Defendant told Meade he would hire a man named Bruce Gentry to transport the films. Meade made several other phone calls to defendant at Las Vegas in an attempt to hurry up the sale because Meade and the BCI still did not know where the films were.

On December 14, 1974, Meade again called defendant in Las Vegas to report he had a truck ready to transport the films. In reality the rented truck had been supplied by the BCI. On December 15, 1974 defendant, from Las Vegas, told Meade to go to defendant's farm outside Cedar Rapids where the films were located. Meade found there were other employees at the farm. From them Meade borrowed a van and, by prearrangement with the BCI, took samples of the films to a Cedar Rapids motel where they were shown to the BCI agents. Meade did this while defendant's other employees loaded the truck which Meade had brought with him.

Meade then drove the truck and parked it at a truck dealership across from the Cedar Rapids motel. Later that day Meade and a Mr. Lavin (another of defendant's employees) went to the airport to pick up Bruce Gentry and Dennis Leone who had flown in from St. Louis to transport the films.

Later the same evening Meade, Gentry, and Leone went to meet defendant who had just flown in from Las Vegas. They met him at defendant's home in Cedar Rapids where arrangements were made to transport the films to a Cedar Falls motel where the BCI had arranged for the purchase.

Cedar Falls is in Black Hawk County. Gentry and Leone were to drive the truck and would be paid $5000 each for their services. Meade would drive in a lead car. Defendant gave the following additional instructions as to the actual transfer of the films:

The films were to be shown and half the money was to be exchanged first. If there were any "double cross" defendant instructed them to start shooting. Meade was armed with a .22 automatic. Defendant was also to supply two guns for protection. Later all went to defendant's warehouse where he paid the men and got one gun (not two) which was given to Gentry. After leaving the warehouse all went to the phone booth across the street to call Paul Swangle at the motel in Cedar Falls. Swangle, a BCI agent, posed as a buyer from Los Angeles. Defendant, not knowing his real identity, talked with Swangle and agreed on a selling price of $50,000.

After leaving defendant at his house in Cedar Rapids, Meade, Gentry, and Leone went back to the truck and left for Cedar Falls at approximately 1:00 a. m. When they arrived at Cedar Falls they went to a restaurant across from the designated motel and, at approximately 3:00 a. m., called Swangle at his motel room.

Meade then went into Swangle's room alone. At the BCI's request he called Gentry and Leone and told them to park the truck in front of room 127. Following the BCI's instructions, Meade told Gentry to instruct Leone to get out of the truck. At that point one person inside the motel room was to come out and look at the films. At the same time Meade would go inside with the other person. When all gathered for the transfer of money and films the BCI agents arrested Gentry and Leone. Defendant's arrest occurred later.

I. For his first assignment of error defendant states "the State failed to present evidence that defendant committed said crimes or any elements thereof in Black Hawk County."

The only events occurring in Black Hawk County were those described as having occurred in Cedar Falls. Defendant was not

physically present in Black Hawk County at any material time. Prior to trial defendant objected to the place of trial [1] as provided in § 753.2, The Code: "Criminal actions shall be tried in the county in which the crime is committed, except as otherwise provided by law. All objections to place of trial are waived by a defendant unless he objects thereto prior to trial."

Defendant preserved his challenge to the place of trial by his pretrial motion, renewed at and after trial. Section 753.3, The Code, lists special provisions for places of trial including cases where elements occur in two or more counties:

"If conduct or results which constitute elements of an offense occur in two or more counties, prosecution of the offense may be had in any of such counties. In such cases, where a dominant number of elements occur in one county, that county shall have the primary *right* to proceed with prosecution of the offender." (Emphasis added.) § 753.3(1).

A certain amount of confusion results when the statutory requirements for place of trial are compared with the proof requirements of place of offense. These related questions take on a different context under the last sentence of § 753.2 when there is no pretrial objection to place of trial. *State v. Donnelly*, 242 N.W.2d 295, 297 (Iowa 1976).

▮ Defendant's timely objection to venue in the instant case did preserve the question. But it is to be remembered that the question preserved was demoted in its importance by a legislative amendment effective July 1, 1973. In *Donnelly*, supra, 242 N.W.2d at 297 we pointed out:

"Two basic changes were made in 1973. *In the first sentence of section 753.2 language making venue a jurisdictional fact was replaced with language stating simply that 'Criminal actions shall be tried in the county in which the crime is committed.*

\* \* \*.' At the same time, a second sentence was added which waived 'all objections to place of trial' unless objected to prior to trial." (Emphasis added.)

▮ Accordingly, references in our earlier criminal cases relating to venue, and which describe venue as "jurisdictional", must be read in the light of the legislative mandate demoting the dimensions of the venue question. And it must be remembered that physical presence of an accused was not required for Iowa venue, even prior to the 1973 amendment.

It is unnecessary for us to decide what the effect of the 1973 amendment might be where no elements of an offense can be shown within the county where the crime is alleged. We believe defendant, acting through his agent, perpetrated elements of aiding in concealing stolen goods in Black Hawk County. And we believe, under the same theory, the conspiracy was continued and renewed in Black Hawk County.

It must be conceded two factors tend to bolster defendant's position. Defendant acted in Black Hawk County, if at all, only through an agent. And it is to be remembered Meade's acts in Black Hawk County all occurred while he was serving in a dual capacity. However we believe these two factors, considered separately or together, do not destroy the State's case.

▮ It is commonly held that a person is criminally responsible for acts which, as principal, he directs through his agents. We note and approve the following: " \* \* \* The well-established theory of the law is that where one puts in force an agency for the commission of crime, he in legal contemplation accompanies the same to the point where it becomes effectual \* \* \*." I Wharton's Criminal Procedure, § 18, pp. 55–56 (12th ed. 1974). See also 21 Am.Jur.2d, Criminal Law, § 386, pp. 405–

---

1. The place of trial requirements of § 753.2 (venue) are to be distinguished from questions of jurisdiction. The statewide claims for crimi-

nal jurisdiction in Iowa are outlined in § 753.1, The Code. See *State v. Wardenburg*, 261 Iowa 1395, 1400, 158 N.W.2d 147, 150 (1968).

406; 22 C.J.S. Criminal Law § 134, pp. 356–357.

Defendant does not seriously dispute the rule which holds persons responsible for criminal acts perpetrated through their agents. But defendant argues no such rule could apply here because he believes any illegal acts were concluded in Linn County. He points to our rule that an overt act is not an element of the crime of conspiracy in Iowa. See *State v. Jennings*, 195 N.W.2d 351 (Iowa 1972). Defendant also argues that, because Meade acted for the BCI, he acted legally in Black Hawk County.

■ To consider these claims we turn first to the charge under § 712.1. We note " * * * [t]o establish concealing of stolen property the State need not prove actual hiding or secreting of the goods. It need only show defendant committed acts which rendered more difficult discovery or identification of the property by its owner. (Authority)." *State v. Sheffey*, 234 N.W.2d 92, 96 (Iowa 1975). Defendant, acting through all those he sent into Black Hawk County, clearly made discovery or identification of the property more difficult.

■ Defendant's act was not changed by Meade's dual role. The basis for holding a principal accountable when he acts through an agent derives from the principal and not from the agent. The doings of the agent are attributable to the principal because the principal chooses to act through an agent. Defendant's purpose and conduct were unaffected either by any loyalty or by what defendant may now believe to be treachery by Meade.

■ The instant case is to be distinguished from those in which the owner of goods encourages, connives at, and participates in the inception of a crime. Under such circumstances questions arise as to the illegality of a taking. However where there already exists an illegal conspiracy it is not legitimatized by arranging for a delivery for the purpose of apprehending the guilty party. *Shaw v. People*, 72 Colo. 142,

209 P. 812, 812–813 (1922). See 15A C.J.S. Conspiracy § 50, p. 779.

■ We agree a conspiracy was shown to have been perpetrated in Linn County. And it is true, under *Jennings*, supra, no overt act was a necessary element of that conspiracy. But it does not follow defendant could not be convicted in Black Hawk County on the basis of an overt act arising from the conspiracy. Once a conspiracy is entered into it continues until terminated. The burden is upon a conspirator to show it has ended. *State v. Kidd*, 239 N.W.2d 860, 864 (Iowa 1976). Every act in furtherance of the conspiracy is considered a renewal or continuance of the unlawful agreement. The conspiracy continues so long as there are overt acts in furtherance of its purpose. 15A C.J.S. Conspiracy § 35(2), pp. 724–726; 16 Am.Jur.2d, Conspiracy, § 29, p. 142.

■ We should also discuss the parties' dispute as to whether defendant's conviction may be affirmed on the theory he was an accessory rather than a principal. Defendant believes such a theory differs from the one under which he was convicted in district court. He points to *State v. Hochmuth*, 256 Iowa 442, 127 N.W.2d 658 (1964) which stands for the proposition the State is bound by its theory of prosecution under § 712.1, The Code. In *Hochmuth* we said § 712.1 defines one crime which may be committed three ways: (1) buying; (2) receiving; or (3) aiding in concealing stolen goods. The State is bound by whichever of the three ways it charges defendant under the section.

■ However this does not mean, as defendant argues, the State is precluded from asserting the defendant was an accessory rather than a principal. We recently explained the effect of § 688.1, The Code, abrogating the distinction between principals and accessories, in *State v. Rydel*, 262 N.W.2d 598 (Iowa 1978). To have charged defendant as an accessory would have been surplusage under § 688.1. The State's right

to consider defendant an accessory was in no way affected by failure to include language indicating defendant was an accessory rather than a principal.

■ Under the foregoing principles we hold defendant was not entitled to a dismissal of either count on the basis of the State's failure to prove venue in Black Hawk County.

II. In his second assignment of error defendant argues he was entitled to a dismissal of both counts on the basis of "take-back entrapment." We explained the legal defense of take-back entrapment in *State v. Overmann*, 220 N.W.2d 914, 917 (Iowa 1974);

" * * * [I]f an accused produces evidence disclosing (1) the government, through an agent or informer, supplied drugs to defendant, and (2) the government, through an agent or informer, later reappropriates any of those drugs from the accused, then a 'take-back entrapment' is shown. *Under those circumstances the State must come forth with evidence which contradicts either of the above two elements. In event the State fails to so do then an accused is entitled to a dismissal as a matter of law.* If, however, the State does produce evidence sufficient to create a fact issue as to a 'take-back entrapment' the case should be accordingly submitted to the jury. (Authorities)." (Emphasis added.)

Under this theory defendant argues the State, through its agent (Meade), supplied the alleged stolen property to defendant, through defendant's accomplice (Gentry), for the explicit purpose of the State later taking back the property in order to prosecute defendant in Black Hawk County. The trial court rejected defendant's argument and submitted the question of take-back entrapment as a factual issue to the jury. Defendant's challenge is to the appropriateness, not the form, of the trial court's instruction on the subject.

In denying defendant's motion to dismiss the trial court pointed to defendant's possession of the films from prior to the time Meade became a BCI informer. Defendant argues the trial court in effect carved out a new exception to the take-back entrapment rule. Defendant argues: "Under the trial court's ruling, a jury would have the discretion to apply or not the defense of 'take-back entrapment' if the State's original possession of the contraband was preceded in time by possession by defendant." For reasons we shall attempt to explain, we disagree with defendant's understanding of the basis for the trial court's ruling.

The State points out defendant had possession of the films from the time he acquired them and kept either actual or constructive possession until they were delivered for sale. The State does not believe the films were supplied by the State to defendant as a result of Meade's driving the rented truck to defendant's farm, at defendant's instructions, to get the films. The State argues Meade's capacity as a BCI informer at the same time he, as defendant's agent, executed defendant's instructions does not import the State had possession of the films. Rather it merely denotes the police were keeping a close watch on defendant's conduct and were allowing him to consummate his plan of sale. The State believes its involvement was limited to setting up the sale of stolen goods to a government agent. The State relies on *United States v. Chisum*, 312 F.Supp. 1307 (D.C. Cal.1970) and *United States v. Mahoney*, 355 F.Supp. 418 (D.C.La.1973). On this basis the State concludes take-back entrapment did not exist as a matter of a law.

The key question is Meade's capacity when he took the films from defendant's farmhouse to the Cedar Rapids motel to await Gentry and Leone as they flew in from St. Louis. Did Meade then have possession of the films as a BCI agent or did he have possession as defendant's agent?

■ On this record we believe Meade was acting under consistent instructions both from defendant and from the BCI. Under the circumstances a factual issue

was generated. The jury was clearly entitled to find the government never came into possession of the goods at the critical time as a result of Meade's involvement. It was in no way prejudicial to defendant to submit the question to the jury. We need not consider whether it would have been error to hold as a matter of law that there was no take-back entrapment. It is enough for us to hold defendant's contention he was entitled to a dismissal on the basis of take-back entrapment is without merit.

As both defendant's assignments are without merit the judgment of the trial court is affirmed.

AFFIRMED.