# Richmond

## BEVERLEY GAY EDWARDS V. COMMONWEALTH OF VIRGINIA

April 21, 1978.

Record No. 771146.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Harman and Compton, JJ.

*Paul M. Shuford* for plaintiff in error.

*Thomas D. Bagwell, Assistant Attorney General (Anthony F. Troy, Attorney General,* on brief) for defendant in error.

HARRISON, J., delivered the opinion of the Court.

In the court below Beverley Gay Edwards was indicted for "feloniously and unlawfully and knowingly" receiving "money from the earnings of a female engaged in prostitution not for a consideration deemed good and valuable in law". At the time of her trial on this indictment the court and jury also heard an appeal by the defendant of her conviction in the General District Court on a warrant charging that she did "unlawfully aid and abet in the commission of prostitution at 801 West Broad Street, Richmond, Virginia". At the conclusion of his evidence the Commonwealth's Attorney was permitted, over the objection of defendant, to amend the indictment to charge that defendant "did feloniously, unlawfully and knowingly receive money or other valuable thing for or on account of procuring for or placing in a house of prostitution or elsewhere any female for the purpose of using her to engage in unlawful sexual conduct".

After permitting the amendment the trial court stated that the defendant was entitled to a continuance. Defendant did not make such a motion and proceeded to introduce her evidence. At

the conclusion of the introduction of all the testimony and of argument by counsel defendant was arraigned on the amended indictment. This was done over the objection of defendant, and she waived her right to plead anew to the amended indictment. The court then directed that a plea of not guilty be entered on behalf of the defendant to the amended indictment.

The jury found the defendant guilty of the offenses charged and fixed her punishment at confinement in the penitentiary for five years under the amended indictment, and confinement in the city jail for twelve months under the warrant.[1] The court entered judgment on the jury's verdict, and this appeal was noted.

The issues in the case are whether the defendant has been convicted under two statutes for the same offense, and whether the trial court erred in amending the indictment and rearraigning the defendant. To resolve these questions we review the evidence and proceedings had in the lower court.

Beverley Gay Edwards was the manager of an operation at 801 West Broad Street in Richmond known as the "Joy Girl Dating Service" (Joy Girl). The Commonwealth contends that this was a business which sent prostitutes to men who called and requested their services. The evidence established that for each date Joy Girl received $15 which it designated as an "escort fee". The girls who were sent on dates earned no salaries but received "tips" from their customers.

On September 12, 1976, Officer Annette M. Kidwell, assigned to the Vice Division of the Richmond Bureau of Police, telephoned Joy Girl and advised the person who answered the phone that she was interested in getting a job there. She was told by a woman who identified herself as "Gay", and who said she did the hiring, that there were openings and to come to 801 West Broad Street the next evening. Kidwell testified that Edwards asked "if I had done this type of work before, working in a massage parlor" and that she replied in the affirmative.

The following evening Kidwell went to Joy Girl, was interviewed by the defendant, and agreed to report for work a day later. She said that Edwards explained that "it was an out

---

[1] A warrant charging that the defendant kept a bawdy house at 801 West Broad St., Richmond, Virginia, in violation of Code § 18.2-357, was dismissed by the court for insufficient evidence to support it.

call dating service; that customers called in. She sent girls out on assignments with these men". Edwards was seated at the front desk where she could take the telephone calls. Kidwell said that at no time during any of her discussions with Edwards did the defendant ever mention "doing any massages". Kidwell described the establishment as having flashing lights on the front, red curtains in the windows, and a sign which read either "Joy Massage", or "Joy Escort Dating", with a picture on it similar to the "Playboy Bunny type ... female figure". She testified that Gay Edwards filled out an index card with her name, which she fictiously gave as "Jeanie Cooper".

Kidwell said that while she was talking to Edwards during their first interview, "a customer came in and wanted to see the girls that were available". This customer was staying in Richmond and had seen the Joy Girl's advertisement in his motel, and "he wanted to view the girls". At that time there were three girls in the back room, Carolyn, Bobbie and Burnie, and they were all "brought to the front". Kidwell testified that the prospective customer said he was "very interested in the girls that she [Gay] had to offer" and that Gay told him to go back to his motel and to call back and she "would send him the girl he chose".

Kidwell said that the defendant explained to her the $15 escort service fee and told her that the money she made would be from "tips"; that "their tips were for what they did on the date"; and that Gay stressed, "I had to be very good to her customers and that some of these people had been using her service for a long time". They discussed the mode of transportation to be used from the Joy Girl building to the hotel or motel where the services were to be rendered. Kidwell said she told Gay that she had a driver who was a boy friend; that the defendant said she "did not want boy friends driving because they cause her trouble"; and that "they did not understand the kind of work that the girls had to do and it caused her problems".

Kidwell testified that when the question arose as to her working with particular types, defendant asked "if I did [blacks] and I told her no". She said the defendant volunteered that she did not "do blacks" either and did not expect her girls to, and that she did not have blacks working for her. She testified to a number of telephone calls that were received by defendant, and recalled one in particular during which defendant answered

several questions concerning five of the girls, their appearances, color of hair, personalities and ages. Kidwell said that Edwards seemed "a little put out" when she hung up the phone and observed that some of the people who called "even want to know the size of the girl's ——————". Kidwell said that a girl named Bobbie went out on a call but soon returned. When asked what was wrong she said the guy wanted a "half and half for $25. He said he had gotten it here before". Kidwell said that Gay's response to that was "damn", referring to the amount offered rather than the type of service demanded.

The defendant also explained to Kidwell the "charge system and the use of BankAmericard and Master Charge accounts". Kidwell said that she was told that "no matter what you do with the man" she was to write "services" on the charge slip. It also developed that the defendant kept a "bad card file" on which notations were made regarding the customers. If a girl returned and reported that her customer had been rough, drunk, outspoken or rude, suspected of having a venereal disease, or being on the Vice Squad, this would be noted on a card. Barbara Ann Turner, who worked at Joy Girl during 1976, testified that she would make from four to six trips a night, paying the $15 agency fees to the defendant, and keeping the tips, which amounted to $500 to $800 a week. She said that the defendant took the calls, supplied the drivers and gave the girls information about where to go. She testified that when she went on calls she performed sexual acts about "half of the time". From Turner's testimony, it appears that her employment interview with defendant was conducted along the same lines as was Kidwell's interview.

During the evening of October 14th, the defendant sent Kidwell out on two calls, one to a local motel and the other to a local hotel. In each instance Kidwell went to the room that was listed on a slip of paper given her by Edwards. The customer at the motel told Kidwell the type of sexual services that he desired and that he had $50 to $60 to spend. The customer used his BankAmericard, which was filled out by Kidwell and signed by the customer. Following the completion of the arrangement, Kidwell opened the door to the room and admitted three of her fellow police officers. They explained to the customer that Kidwell was a policewoman and asked him not to inform

Edwards of her status. After this call Kidwell returned to Joy Girl and turned in the $15 agency fee.

Kidwell's call to the hotel followed the same pattern as the call she made to the motel. The customer at the hotel gave the witness $25 plus the $15 agency fee. When asked what he expected for the extra $25 he said, "I want to make love to you or whatever you call it." At this point Kidwell's fellow officers made their appearance, and the customer was requested not to inform Edwards of her status. When she returned to Joy Girl, she gave Edwards the $15 agency fee and requested that she be permitted to go home, claiming that she was ill and had been "hurt inside and had bad pains" as a result of sexual intercourse on her last call. She said that Edwards replied that "she thought that I was used to that kind of work and that was why I got the job. If you can't handle it tell me now, because if you can't, you may as well quit".

Involved in this appeal are three sections of the Code of Virginia. The warrant charges a violation of § 18.2-348, which provides:

> "**Aiding prostitution or illicit sexual intercourse.** — It shall be unlawful for any person or any officer, employee or agent of any firm, association or corporation, with knowledge of, or good reason to believe, the immoral purpose of such visit, to take or transport or assist in taking or transporting, or offer to take or transport on foot or in any way, any person to a place, whether within or without any building or structure, used or to be used for the purpose of lewdness, assignation or prostitution within this State; or procure or assist in procuring for the purpose of illicit sexual intercourse, or to give any information or direction to any person with intent to enable such person to commit an act of prostitution. . . ."

Edwards was indicted under Code § 18.2-357, which reads:

> "**Receiving money from earnings of female prostitute.** — Any person who shall knowingly receive any money or other valuable thing from the earnings of any female engaged in prostitution, except for a consideration deemed good and valuable in law, shall be guilty of pandering, punishable as a Class 4 felony. . . ."

The indictment was amended and Edwards was convicted under the amended indictment for violation of Code § 18.2-356, which provides:

"**Receiving money for procuring female.** — Any person who shall receive any money or other valuable thing for or on account of procuring for or placing in a house of prostitution or elsewhere any female for the purpose of causing her to engage in unlawful sexual intercourse shall be guilty of a Class 4 felony. . . ."

██ The evidence was sufficient to convict Edwards of aiding and abetting in the commission of prostitution, and the conviction does not depend upon the testimony Officer Kidwell gave regarding the calls that she personally answered from prospective customers at the local motel and hotel. The testimony of the witnesses supports a finding that 'the operation or business carried on by defendant at 801 West Broad Street was a venture by her, for financial gain, to aid and abet and to give information and direction to persons desiring the services of a prostitute, and to procure and assist persons who were willing to provide such services.

The whole format of the Joy Girl Dating Service suggests the nature of its business. No pretense is made that this was a health club, or a place where a bona fide massage could be obtained, or where any services would be performed. The testimony of the police officers and other witnesses supports a finding that Joy Girl was strictly a medium or conduit through which orders for prostitutes were received, processed and filled. We find little in the record to indicate that any stranger in Richmond ever called Joy Girl for a female escort to accompany him to dinner, a movie, the symphony or the museum. It was a business, and its *modus operandi* was developed by the testimony of Officer Kidwell and the other witnesses. The defendant provided the girls a base from which they could operate, advertised their presence, described to prospective customers their physical characteristics, got them "dates", and then dispatched them to designated hotel and motel rooms in automobiles with drivers supplied by Joy Girl. For those who did not wish to pay in cash Joy Girl permitted the use of credit cards. The defendant even kept records on customers, hoping thereby to avoid contact with members of

the Vice Division or troublemakers. Clearly, a violation by Edwards of the provisions of § 18.2-348 was shown.

■ We find no error in the action of the trial court in permitting the indictment to be amended. Aside from the policy of the law which allows amendments which tend to the furtherance of justice where such amendments do not seriously prejudice the rights of the accused, the amendment complained of did not "change the nature or character of the offense charged".[2]

Virginia Code §§ 18.2-355 through 18.2-360 are designed to prohibit illicit prostitution and procurement. Over a long period of time these sections have been considered together[3] because they are all designed to accomplish the same purpose, to prohibit any act of exploiting the prostitution of a female. It is immaterial whether the act be called pandering or pimping. Pander means "to pimp, to cater to the gratification of the lust of another". Black's Law Dictionary 1265 (4th ed., rev. 1968). It includes the procuring of one person by another for illicit sexual intercourse. The pandering can consist of either procuring a female for a place of prostitution or procuring a place of prostitution where the female can ply her trade. In 2 Wharton, *Criminal Law and Procedure* § 768, at 598 (R. Anderson ed. 1957), pandering is described as:

"In general terms, any act of exploiting the prostitution of a female is known as pandering or pimping and as such is commonly prohibited by statute. It includes any act of procuring of one person by another for illicit sexual

---

[2]Code § 19.2-231 provides:

**Amendment of indictment, presentment or information.** — If there be any defect in form of any indictment, presentment or information, or if there shall appear to be any variance between the allegations therein and the evidence offered in proof thereof, the court may permit amendment of such indictment, presentment or information, at any time before the jury returns a verdict or the court finds the accused guilty or not guilty, provided the amendment does not change the nature or character of the offense charged. After any such amendment the accused shall be arraigned on the indictment, presentment or information as amended, and shall be allowed to plead anew thereto, if he so desires, and the trial shall proceed as if no amendment had been made; but if the court finds that such amendment operates as a surprise to the accused, he shall be entitled, upon request, to a continuance of the case for a reasonable time. . . ."

[3]Note the language of Code § 18.2-360 which provides, in part, that "[a]ny female referred to in §§ 18.2-355 through 18.2-361 shall be a competent witness in any prosecution under such sections to testify to any and all matters. . . ."

intercourse for a consideration to the procurer, for a share in the receipts of the prostitute."

Code § 18.2-356 prohibits pandering. It reaches the person who receives money for procuring any female to engage in unlawful sexual intercourse. But Code § 18.2-357 also prohibits pandering. Significantly, in enacting § 18.2-357, the General Assembly provided that any person who receives any money from the earnings of a female engaged in prostitution, except for a consideration deemed valuable, shall be guilty of pandering. The two sections were enacted to accomplish the same purpose, prohibit commercial prostitution. A bellman in a hotel who is given $10 by a guest to procure for him a prostitute, and does so, violates Code § 18.2-356. If he also receives from the prostitute a portion of her fee for the service she rendered the guest, he violates § 18.2-357. These two sections are so interrelated that an indictment drawn under one could be subsequently amended to charge a violation of the other section if the evidence showed such a violation. That, in effect, is what occurred in the case under review.

The money Officer Kidwell paid Edwards was not paid from her earnings for engaging in prostitution, but to satisfy the agency fee due Edwards for placing Kidwell in the motels for the purpose of causing her to engage in unlawful sexual intercourse. The indictment was amended to meet this variance between the allegation of the indictment and the evidence offered in proof thereof.

A violation of either § 18.2-356 or § 18.2-357 constitutes a Class 4 felony. The accused has to receive money or other valuable thing in connection with an act of prostitution. The only difference is that under one section the source of the money paid is immaterial and it can be received either before or after the procuring or the placing of the female. A violation does not depend upon an act of sexual intercourse having occurred. Under the other section the money must be knowingly received from the *earnings* of the female, and therefore after the act of prostitution. It is not the prostitute that these statutes seek to reach but the one who profits from an act of prostitution by another.

Defendant claims that the amendment was "one of critical substance, nature and character" and "served to predicate a

new and totally unexpected felony charge on precisely the same actions and statements". We disagree. Because of the similarity of purpose and subject matter of the sections, an amendment to an indictment which changes the Code provision under which a defendant is charged from § 18.2-357 to § 18.2-356 does not change "the nature or character of the offense charged" and is permissible under the provisions of § 19.2-231. Moreover, the short answer to defendant's claim is that the amendment came at the conclusion of the Commonwealth's evidence, and the court offered to continue the case if the defendant was taken by surprise and desired a continuance.

▮ The fact that the actual physical changes or amendments on the face of the indictment were not made until the conclusion of all the evidence and during closing argument of counsel is immaterial. The trial court had announced to counsel and to the defendant that the motion to amend was granted. The trial proceeded from that point on the amended indictment, and this with the full knowledge of all parties involved. The instructions granted were consistent with the allegations of the amended indictment and the evidence thereon.

▮ Defendant also complains of the action of the court in arraigning Edwards on the amended indictment after the jury had retired to deliberate. The record discloses a rather lengthy exchange between the court and counsel at the time the Commonwealth's Attorney made his motion to amend. It was following argument thereon that the court granted the motion, advised defendant and her counsel that she was entitled to a continuance, and was informed by counsel for defendant that he was "debating the matter". The court then recessed the trial until the following morning. When it resumed the argument was continued, the trial court adhered to its ruling and permitted the amendment, no motion was made for a continuance, and the defendant proceeded to introduce testimony in her behalf.

At the conclusion of the taking of all the testimony, counsel for defendant brought to the attention of the court the fact that his client had not been rearraigned on the amended indictment. The court observed: "I think that the statute says that she does have to be rearraigned. Well, I think we got

confused on that because I offered the defense a continuance but he was not sure last night. We will let her be rearraigned now. If she [Edwards] wants to change her plea we will take it." The court sought to determine if the defendant wished to be rearraigned and "to plead anew". Counsel for defendant stated that defendant did not "desire to re-plead" and waived her right to do so. The court then proceeded to have the clerk arraign the defendant and entered a plea of not guilty on her behalf.

We can find no prejudice to defendant as a result of the delay in arraignment. She entered a plea of not guilty to the indictment as it was originally returned by the grand jury. When the court granted the amendment she did not seek a continuance. When she was rearraigned and given an opportunity to change her plea she did not do so, and a plea of not guilty was entered in her behalf. This action by the court was consistent with her plea to the original indictment, and with her theory of the case.

We find no reversible error in the judgment of the lower court, and accordingly, it is

*Affirmed.*