### Richmond

## ROBERT O'DELL COLLINS, JR.

### V.

## COMMONWEALTH OF VIRGINIA

October 14, 1983.

Record No. 830265.

Present: All the Justices.

*R. Wayne Dawson* for appellant.

*Karen A. Laserson, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Robert O'Dell Collins, Jr., was tried by a jury on an indictment charging him with violation of the pandering statute, Code § 18.2-356.* Finding him guilty as charged, the jury fixed his punishment at confinement in the State penitentiary for 10 years; the trial court entered judgment on the verdict.

On appeal, Collins contends that the trial court erred in admitting, over his objection, evidence that at other times he had committed offenses similar to the offense charged in the indictment. He also argues that the evidence was insufficient to support his conviction.

Collins and a co-defendant, Lewis Barney Brooks, operated, under various trade names, an escort service which arranged by telephone for customers to have dates with escorts provided by the agency. On August 2, 1981, Linda G. Fox, a Richmond Police Department officer working undercover as a decoy, met Collins to be interviewed for employment in the escort service.

Fox testified that she used the name "Lynn" in this assignment and that Collins used the name "Bob Holliday." In their interview, Collins asked what she "thought the service was," and Fox replied, "[J]ust an escort service." Collins showed her an agreement containing a paragraph providing that any violation of local, State, or Federal law by the escort would give cause for immediate termination of employment. When Fox inquired about the meaning of the paragraph, Collins said, "I guess if you get caught, it's illegal." Although Collins did not ask Fox to sign the agreement at that time, he told her he would require her to sign it before he employed her. Collins informed Fox that he would communicate with her if he needed any more help.

Fox testified that the day after her interview with Collins she telephoned the escort service, talked to Steven Zipp, the telephone operator, gave him her name and telephone number, and told him she was available for work. Zipp said he would call "if he needed any help that night."

About four hours later, according to Fox, Zipp called back and said he had a date for her with one John Kelley at a specified address in Henrico County. Zipp instructed her to collect the $15

---

* § 18.2-356. **Receiving money for procuring person.**—Any person who shall receive any money or other valuable thing for or on account of procuring for or placing in a house of prostitution or elsewhere any person for the purpose of causing such person to engage in unlawful sexual intercourse or any act in violation of § 18.2-361 shall be guilty of a Class 4 felony.

agency fee payable to the escort service and to call back that "everything was okay." Fox proceeded to Kelley's apartment to keep the appointment. After collecting from Kelley in cash the $15 agency fee, she agreed to engage in acts of sexual intercourse and sodomy with him for an additional $60. She then telephoned Zipp to ask whether she could accept Kelley's check for these services. Replying in the affirmative, Zipp cautioned Fox to make sure Kelley had "a recent deposit slip." While Kelley was writing the check, other police officers, alerted by Fox, entered the apartment and arrested him.

Zipp, charged with the same offense as Collins, testified as a witness for the Commonwealth. He stated that Collins had hired Fox and that her name tag "Lynn" was tacked on the board in the office along with the name tags of other girls employed by the agency. Zipp said that he called Fox on August 2 and connected her with Kelley, and that he listened to the telephone conversation while Fox and Kelley arranged to meet.

Zipp testified that Collins and others had trained him to disconnect the office telephone if customers persisted in mentioning specific sexual acts. He acknowledged that Fox had called him from Kelley's apartment to inquire whether she could take Kelley's check for "a blow job and a roll" and that he had approved because Kelley was a regular customer. Zipp asserted that although he had his "suspicions" about what the escorts were doing on their dates, he had no proof, and what the girls did was their own business. Nevertheless, Zipp recalled one occasion when Collins got into an argument over money with Shelly, Collins's girlfriend, who was employed by the agency as an escort. Zipp observed Collins take all the money from Shelly's pocketbook. Demanding that he give the money back to her, Zipp testified, Shelly "said something about . . . 'it's not your pussy' and then they were arguing some more."

About 11:30 p.m. on August 2, Officer R. E. Saylor and other police officers executed a search warrant by conducting a search of the premises where the escort service's office was located. The officers seized telephone equipment, including an answering recorder connected with several telephones, ledgers containing names and addresses of customers, names of escorts, fees paid to the agency, card files showing names of customers and amounts they paid, blank employment agreement forms, and pre-stamped envelopes addressed to "Anthony Giovanni" at a certain Rich-

mond post office box. The index cards included names of persons identified as law-enforcement officers. Name tags for girls the agency employed were seized, including one for "Lynn," the name used by Officer Fox. Saylor identified cards showing "good calls," where fees were paid, and others showing "bad calls," where the callers would not pay the required charges, or were suspected of being police officers, or the transactions were not completed for other reasons noted on the cards.

Saylor testified that at the time the premises were searched, three outcall escort services were being operated there under the names of Dreams Unlimited, Kitty Kats, and Hound Dogs All Male Escort. All three were listed in the classified advertisements of local newspapers.

After the events of August 2, Saylor testified, he and another officer met with Collins at the latter's request. Collins wanted to know why Saylor "was so intent after him." Collins informed the officers that he had been operating a service in which he would send girls out when he needed their services, that he considered himself "more or less a talent agent," and that he was not aware of what the girls did when they responded to the calls.

Terry Brady, another telephone operator for the agency, also testified as a witness for the Commonwealth. He described in detail the operation of the business. The escort was required to collect in cash from the customer and deliver to the agency a $15 agency fee for the first hour and $10 for an additional hour. In addition, the escort generally collected a "tip" for services rendered, which Brady defined as sexual intercourse; from this tip the escort paid the agency a referral fee of $10 per hour. Brady identified the charges on agency records seized by the police officers and introduced in evidence. The escorts used the pre-stamped envelopes addressed to "Anthony Giovanni," a name which Brady said was fictitious, to mail checks or money orders for fees to the agency at its post office box.

According to Brady, Collins and Brooks established the practice of having each escort who paid the agency fees in person at the office leave a $5 tip for the telephone operators for each "good call." To Brady, a "good call" was one where the escort and the customer agreed on charges and the escort stayed an hour and collected in addition to the agency fee whatever amount she required for her services. If the escort could not reach an agreement

with the customer after collecting the agency fee the agency "would send out another escort."

Brady was familiar with the employment agreement providing for termination of employment upon violation of any law. Although he signed one himself and delivered others to some of the girls to sign, he regarded the agreements as meaningless. He said that Collins instructed him in answering the agency telephone. Brady was told that if a customer used "nasty words" in asking for a girl to perform an "illicit sexual act" he was to hang up, but he was also taught the special language, innocuous in itself, used by those familiar with "the business" to mean various kinds of sexual activity. Brady collected the money from the girls and kept a record of the payments. Collins and Brooks took their shares in cash; Brady retained his tips.

Kim G. Cleary, an informant who arranged for Officer Fox to meet Collins, testified that she herself was interviewed by Collins in August 1981 before Fox's interview. Refreshing her memory from notes she made about an hour after her interview, Cleary said she applied by telephone for employment with the escort service. She was then interviewed by Collins in his car. Collins, who gave his name as "Bob Holliday," informed her that the job might mean "holding someone's hand or hugging someone or sleeping with them, touching them." She could expect to receive tips for her services. Although Collins did not say she was hired, he asked when she could work, and when Cleary said the next day, he expressed satisfaction. He did not show her any employment agreement. Collins did not want to meet Fox, and he asked Cleary to "fill her in." Cleary, however, suggested that he meet Fox.

Over Collins's objection, the trial court permitted the Commonwealth to introduce the testimony of two former employees of Collins and Brooks. Brenda Walker testified that they employed her as a prostitute on December 8, 1981, after she signed one of the employment agreements. When she went on calls she performed various sexual acts, including sodomy. On each call she collected an agency fee of $15, which she paid the agency; out of her tip she paid the agency another $10. When business was good, she earned approximately $2,200 a week. Referring to Collins and Brooks, she said, "I knew what business these gentlemen were in as well as they knew what [business] I was in."

Judith Blain testified that Collins approached her in August 1980 about working for him in an " 'escort relaxation agency.' "

When asked what the work involved, he said " 'Prostitution.' " Collins told Blain that before employing her he would " 'have to have an interview' " with her to see what she could do; the interview consisted of going to a motel where they had sexual intercourse and oral sex. She was then employed by the escort service, paying the agency a $20 agency fee for each call and 45 percent of the tips she collected for her sexual activities with customers.

Blain said that to make certain she was not "ripping him off," Collins conducted what he called "spot check billies," by telephoning customers, before she returned to the agency from her calls, to find out what acts Blain had performed and how much money she had received. Upon her return, Collins would inquire about her activities and then tell her what the customers reported she had collected.

Collins argues that the testimony of Walker and Blain relating to other offenses was inadmissible. He acknowledges that evidence of other offenses may be admissible to show motive, intent, or knowledge under an exception to the general rule of inadmissibility, as set forth in *Kirkpatrick* v. *Commonwealth,* 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970). *See Lewis* v. *Commonwealth,* 225 Va. 498, 303 S.E.2d 890 (1983); *Brooks* v. *Commonwealth,* 220 Va. 405, 258 S.E.2d 504 (1979); *Bullock* v. *Commonwealth,* 205 Va. 558, 138 S.E.2d 261 (1964), *cert. denied,* 382 U.S. 927 (1965); *Hubbard* v. *Commonwealth,* 201 Va. 61, 109 S.E.2d 100 (1959); *Sloan* v. *Commonwealth,* 199 Va. 877, 102 S.E.2d 278 (1958). Collins says, however, that the offenses described by Walker and Blain were too remote in time from August 2, 1981, to show that he had knowledge of what was happening on that date, and the real purpose of the Commonwealth was to show his propensity towards committing the offense charged. We do not agree.

■ Under Code § 18.2-356, the Commonwealth was required to prove that Collins received money for the purpose of causing a person to engage in prostitution. Knowledge of the illegal activity was a prerequisite to conviction.

Walker testified that she worked as a prostitute for Collins for four months beginning in December 1981, that Collins knew what she was doing, and that he accepted his share of the money she earned from her sexual activities. Thus, her testimony related to events that occurred four months or more after August 2, 1981. Blain testified that she was recruited by Collins to work as a pros-

titute and did so from August 1980 to January 1981. Thus, her testimony related to events that occurred eight months or more before August 2, 1981. The testimony of these witnesses, however, tended to show that Collins was running a prostitution business as a continuing course of conduct over an extended period of time, so that he not only knew his employees were engaging in prostitution, but he also hired them for that purpose, aided and abetted them in their work, and received money from their earnings as prostitutes.

Where evidence of other offenses is admissible under an exception to the general rule, the exception applies to offenses committed before and after the date of the offense for which the defendant is being tried. *See Harris* v. *Commonwealth,* 211 Va. 742, 743-44, 180 S.E.2d 520, 522 (1971). In *Minor* v. *Commonwealth,* 213 Va. 278, 191 S.E.2d 825 (1972), a pandering case, evidence was admitted of a similar offense that occurred the day after the offense for which the defendant was being tried. We held the evidence was properly admitted to show the defendant's relationship with the prostitute and to show a common scheme, plan, or course of conduct tending to establish motive, intent, or knowledge.

In *Moore* v. *Commonwealth,* 222 Va. 72, 278 S.E.2d 822 (1981), the defendant was charged with enticing and fondling a male child with lascivious intent. The trial court admitted evidence of two similar incidents, one occurring approximately three months after and the other approximately 20 months before the incident in dispute. We held the evidence was admissible on the issue of lascivious intent. *See also Ryan* v. *Commonwealth,* 219 Va. 439, 247 S.E.2d 698 (1978).

We have also held that it is largely within the discretion of the trial court to determine "[w]hether evidence is so remote that it lacks probative value." *Bunch* v. *Commonwealth,* 225 Va. 424, 439, 304 S.E.2d 271, 279 (1983). *See Gibson* v. *Commonwealth,* 216 Va. 412, 415-16, 219 S.E.2d 845, 848 (1975), *cert. denied,* 425 U.S. 994 (1976); *Brown* v. *Commonwealth,* 208 Va. 512, 516-17, 158 S.E.2d 663, 667-68 (1968). In the present case, we hold that the trial court did not abuse its discretion in admitting the testimony of Walker and Blain to show Collins's knowledge, intent, and course of conduct.

In challenging the sufficiency of the evidence, Collins argues that the Commonwealth's evidence falls short of the evidence

supporting the conviction for pandering which we affirmed in *Edwards* v. *Commonwealth,* 218 Va. 994, 243 S.E.2d 834 (1978). Collins says that in *Edwards* the evidence of the defendant's control of the prostitution business was stronger than such evidence in the present case. The defendant who operated escort services in *Edwards* interviewed the undercover police officer who applied for employment and explained that she sent girls out on assignments with men who called the office, and that the girls collected $15 escort service fees for the agency and "tips" for themselves for what they did on the dates. *Id.* at 996-97, 243 S.E.2d at 836. During the interview, an employee complained to the defendant about the low price demanded by a customer for a specified sexual act. The undercover officer agreed to go to work the next day. She was sent on two calls, one to a hotel and one to a motel. She collected the agency fee and a tip for specified sexual activities to be performed on each call, but in each instance she alerted other officers who entered and requested the customer not to reveal the policewoman's status. The policewoman returned to the office, delivered the agency fees to the defendant, and complained that she was suffering pain caused by the sexual intercourse which she pretended had occurred. The defendant replied that if she could not do the work she should quit the job.

The evidence as to the *modus operandi* in *Edwards* is remarkably similar to that in the present case. In each case, girls were sent on assignations arranged by telephone. In each case, the escort collected an agency fee for her employer and tips for herself for sexual services rendered. In each case, cards showing "bad calls" were filed. In each case, the undercover policewoman applying for employment was informed in ambiguous language that she was expected to please the customers because many of them had used the agency services for a long time.

Collins says, however, the evidence shows he never asked Fox to work, never discussed sexual activity with her, never had her sign an employment contract, never received any money for her services, and never knew what she was doing. He says the Commonwealth had to prove he was aware of what was going on to establish that he had constructive receipt of money paid to Fox by Kelley. He conceded in oral argument, however, that if it was shown that he was aware that Fox was going out on calls, it was not necessary to prove that he knew of the specific call on August 2.

The evidence, viewed in the light most favorable to the Commonwealth, is sufficient to show that the business conducted by Collins, euphemistically referred to as an escort service, was call-girl prostitution. The testimony of Brady, Zipp, Officer Saylor, Walker, and Blain clearly established the *modus operandi*. Cleary, who assisted Fox, testified that when she was interviewed for employment before Fox, Collins told her the work might involve sleeping with customers. Brady testified to the language used by knowledgeable patrons of the agency to describe the particular kinds of sexual activity they desired. There is evidence that Collins directed the operation, trained Zipp, and told Zipp that Fox was employed. Fox's name was listed on a card posted in the agency office with the cards of other escorts employed by the agency. When Zipp telephoned Fox to send her out to meet Kelley the jury reasonably could infer that he did so with the prior knowledge and approval of Collins.

Finally, Collins argues there is no evidence that he received the $15 agency fee paid by Kelley to Fox. The escorts employed by Collins, however, were instructed to collect for him from each customer the required agency fee. In collecting these fees, the escorts acted as agents for Collins.

We have approved the definition of agency as a consensual fiduciary relationship " 'which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' " *Murphy* v. *Holiday Inns, Inc.,* 216 Va. 490, 492, 219 S.E.2d 874, 876 (1975) (quoting Restatement (Second) of Agency § 1 (1958)). There was evidence that the escorts in accepting their assignments implicitly agreed to follow Collins's instructions to collect the agency fees on his behalf. Walker and Blain did so. The only question is whether Fox, a law-enforcement officer, was acting as an agent for Collins when she collected the agency fee from Kelley.

If Collins had knowledge that Fox would be sent on a date, and we have held that the jury reasonably could so infer, then he expected her to collect the agency fee on his behalf. In accepting the assignment, Fox expected to carry out her instruction to collect the fee for Collins. She intended, however, to use the collection as evidence against him, thus occupying a dual role as agent for Collins and at the same time agent for the police. Fox never had any intention of engaging in acts of prostitution, but she

did intend to collect the agency fee from Kelley payable to Collins. The agency relationship between Collins and Fox resulted from Collins's consent to allow Fox to act on his behalf to collect the fee from Kelley. Since the relationship was based on Collins's consent, it is unaffected by the fact that Fox was also a police officer.

We have noted that as to certain crimes, but not including rape, one who effects a criminal act through an innocent agent is a principal in the first degree. *See Dusenbery* v. *Commonwealth,* 220 Va. 770, 772, 263 S.E.2d 392, 393 (1980). Thus, a defendant may not escape criminal responsibility for a crime which he arranges to have committed by an unwitting agent. *See State* v. *Johnson,* 255 S.C. 14, 176 S.E.2d 575 (1970); *People* v. *Nunnley,* 34 Ill. App.3d 4, 339 N.E.2d 537 (1975); *People* v. *Taylor,* 30 Cal. App. 3d 117, 106 Cal. Rptr. 216 (1973); R. Perkins and R. Boyce, *Criminal Law* 715 (4th ed. 1982); W. LaFave and A. Scott, *Handbook on Criminal Law* 496-97 (1972).

In *State* v. *Wedelstedt,* 263 N.W.2d 894 (Iowa), *cert. denied,* 439 U.S. 954 (1978), defendant's agent who sold stolen film to him became a police informant. The agent continued to work for defendant, who was ultimately convicted of conspiracy and concealment of stolen goods. *Id.* at 896-97. The Supreme Court of Iowa affirmed the conviction, holding that defendant was responsible for criminal acts perpetrated through an agent, and that defendant's responsibility was not altered by the fact that the agent played a dual role in working for both the police and the defendant. *Id.* at 899.

In the present case, we hold that Collins's criminal responsibility was not altered by Fox's dual role. She was his innocent agent to collect the fee, and she was the agent of the police in acquiring evidence to use against Collins on the criminal charge of pandering. The same result would obtain if one of Collins's regular escorts had responded to a customer's call, collected the agency fee and a tip for sexual favors, and then gone to the police and made a full disclosure. We conclude that the evidence was sufficient to support Collins's conviction.

For the foregoing reasons, we will affirm the judgment of the trial court.

*Affirmed.*