COURT OF APPEALS OF VIRGINIA


Present:  Judges Bumgardner, Humphreys and Clements
Argued at Richmond, Virginia


HISHAM TRAISH
                                            OPINION BY
v.   Record No. 2056-99-4        JUDGE JEAN HARRISON CLEMENTS
                                          JULY 10, 2001
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
                    Joanne F. Alper, Judge

            Peter M. Baskin (Pelton, Balland, Young,
            Demsky, Baskin & O'Malie, P.C., on brief),
            for appellant.

            Eugene Murphy, Assistant Attorney General
            (Mark L. Earley, Attorney General, on brief),
            for appellee.


     Hisham Traish was tried by jury and convicted of grand

larceny, assault and battery, and five counts of attempted petit

larceny.  On appeal, he contends the trial court erred (1) in

denying his motion to have the charges involving different

victims tried separately, (2) in denying his motion to strike

the grand larceny and assault and battery charges because the

evidence was insufficient to support his convictions, (3) in

denying his motion to strike the attempt charges where Traish

obtained money from the victims because there was a fatal

variance between the indictment and the proof, and (4) in

denying his motion to strike the attempt charges because the

legal impossibility of completing the offenses precluded

conviction on those charges.  Finding no error, we affirm the convictions.

## I.  BACKGROUND

Under well-settled principles of appellate review, we examine the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party below.  Burlile v. Commonwealth, 32 Va. App. 796, 798, 531 S.E.2d 26, 27 (2000).

The charges against Traish were as follows:

| Case # | Offense | Date of Offense | Victim |
|---|---|---|---|
| 99-418 | Attempted Petit Larceny | 12/16/98 | Ms. Flanagan |
| 99-417 | Grand Larceny | 12/17/98 | Ms. Lyon |
| 99-424 | Assault and Battery | 12/17/98 | Ms. Lyon |
| 99-425 | Assault and Battery | 12/17/98 | Ms. Lyon[1] |
| 99-419 | Attempted Petit Larceny | 12/19/98 | Ms. Evans |
| 99-420 | Attempted Petit Larceny | 12/26/98 | Ms. Austin[2] |
| 99-421 | Attempted Petit Larceny | 1/05/99 | Ms. Hammond |
| 99-422 | Attempted Petit Larceny | 1/05/99 | Ms. Condon |
| 99-423 | Attempted Petit Larceny | 1/06/99 | Ms. Pittman |

_____

[1] Although dismissed at trial at the close of the Commonwealth's evidence and not a subject of this appeal, this charge is included for purposes of analyzing Traish's first assignment of error.

[2] This case also was dismissed by the trial court at the close of the Commonwealth's evidence and is included for purposes of analyzing Traish's first assignment of error.

Prior to trial, Traish moved the trial court to grant him separate trials on each of the charges involving different victims. He conceded the grand larceny and assault and battery charges could properly be tried together because they involved the same victim and were part of the same transaction. The trial court denied Traish's motion to sever the trial of the offenses, and all of the charges were tried together before the same jury.

At trial, the evidence established that, on December 16, 1998, Adelaide Flanagan, a woman in her eighties, returned home alone from the bank and parked her car in the parking lot of the retirement community in Arlington County where she lived. Traish, wearing a black leather jacket and driving an older, large, blue car, pulled in behind her, got out of his car, and accused her of hitting his car in a local grocery store parking lot. He said: "Why didn't you stop? I honked at you and a cab nearby honked too. You struck my car." Flanagan, who had not heard anyone honking, denied hitting Traish's car. He showed her a mark on the back of her car, a spot where the car had been scratched almost a year earlier. When she again denied hitting his car, Traish showed her a dent on his car where he claimed she hit it. The mark on Traish's car was "much lower" than the mark Traish pointed out on her car. Traish told her he had put in a lot of work getting his car ready to sell but could not sell it now that it was damaged. Flanagan looked at Traish's

driver's license and told him she would report his claim to her insurance company once she got in the house. She did not write his name down at the time, but it was, she recalled, something like "Hashin Frasier."

At that point, Stacy Heil, an employee of the retirement community, came over to assist Flanagan. Traish told Heil that Flanagan had just backed into him in the grocery store parking lot next to the retirement community. Traish again pointed out the marks on the two cars where they had hit. There was, however, Heil noted, a difference of eight to ten inches in the heights of the two marks pointed out by Traish. She took down the name Traish gave her, "Hisham"; his phone number, which turned out to belong to someone else; the temporary license tag number on his car, which expired January 15, 1999; and a description of his car, a 1988 silvery blue Lincoln. She also gave Flanagan the phone number of the police. Feeling Traish's accusation "was not on the up and up," Heil asked Flanagan if she wanted to go inside, and Flanagan responded affirmatively.

Flanagan's encounter with Traish lasted approximately thirty minutes. Flanagan never offered any money to Traish and he never asked for any. Flanagan called the police within a day or two of the incident to report it. At trial, both Flanagan and Heil identified Traish as the man they encountered that day, even though, according to Heil, his hairstyle had changed.

On December 17, 1998, Helen Lyon was driving by herself in Arlington County when she heard someone behind her honking. Traish, who was wearing a black leather jacket, pulled up beside her, rolled down his window, and told her she had hit his car. Lyon, who was returning home after shopping for groceries, pulled over to the side of the road and got out of her car. She knew she had not hit anybody. Traish also pulled over, got out of his car, and pointed to a spot on his car where he claimed Lyon hit it in the grocery store parking lot. She denied hitting his car, saying, "I could not have done that because my car could not have made that [mark]." She suggested they drive to her house where she would call the police and inform her husband.

Traish, however, insisted they handle it there and then and took out his driver's license and showed it to her. She could not identify the picture on it because it was "shiny," but "noticed the name was a long last name." Deciding the best thing to do was to also show him her driver's license, Lyon got back in her car, shut the door, located her license in her wallet, rolled the driver's side window down, and, while sitting in her car, held her wallet up so that Traish could look at her driver's license. At that point, Traish reached through the window, grabbed Lyon's wallet out of her hand, and ran back to his car with the wallet. He got in his car and shut the door. The wallet contained more than five dollars.

Lyon got out of her car and ran to Traish's car to try to retrieve her stolen wallet. In hopes of grabbing either the wallet or Traish's keys so he could not drive away, Lyon attempted to open Traish's car door. However, as Lyon was opening the door, Traish pushed the door into her leg, causing a large bruise, and then quickly pulled the door shut. Lyon opened the door again, but Traish pulled it shut again and drove off with her wallet.

Lyon then drove home and called the police. She described the man who assaulted her and stole her wallet as being thirty-one or thirty-two years old, five feet nine or ten inches tall, and having sandy colored hair and a very small mustache. During the investigation of the incident, Lyon selected Traish's picture from a photo lineup as the man she encountered that day, even though, according to Lyon, his hairstyle in the picture was not the same as when the encounter took place.

At the preliminary hearing, Lyon described the man who assaulted her and stole her wallet as being of "average build, maybe a little bit on the slender side," having hair that was combed straight back and that was not gray, and having a small, dark mustache. When asked if she saw the perpetrator in the courtroom, Lyon initially identified a man seated in the first row of the gallery as the person who assaulted her and stole her wallet. The man's leather jacket, Lyon explained, was like the one the perpetrator wore, even though his face and thinning dark

hair did not resemble the perpetrator's. Upon standing up to better see over an obstruction that had previously blocked part of her view, Lyon saw Traish and, after examining his face, positively identified him as the man who assaulted her and stole her wallet. Even though Traish's "hair was styled differently, he was, according to Lyon, "exactly the same fellow" who committed the crimes.

At trial, Lyon positively identified Traish as the perpetrator. She testified that she had a good opportunity to look at the man during her encounter with him, which occurred around 11:30 a.m. The lighting was "fine," and he was within arm's reach of her during the encounter. Lyon testified that she had no doubt that Traish was the perpetrator.

On December 19, 1998, Mary Jane Evans, a woman in her sixties, having arrived early at the Metro 29 Diner in Arlington County, was sitting alone in her parked car around 9:00 a.m., waiting for her friend, when Traish, driving a large, 1960s-era, light blue sedan, pulled up and parked nearby. He approached Evans and accused her of having hit his car at a construction site near a local grocery store. Evans, knowing she had not hit anybody at that site or elsewhere, denied hitting him. He told her that, after she hit him, he and somebody else had honked at her. Evans had not heard any honking and again denied hitting him.

Traish then showed Evans a dent on his car that he claimed she caused. He told her he was restoring his car and could get a replacement part at the junkyard to repair the damage for twenty-five dollars. He asked her for the money. She questioned how the dent could have been produced without any accompanying scratches around it. "[I]t looked," she told him, "like somebody . . . hit it with a hammer." Traish laughed at that suggestion.

Feeling uneasy about the situation, Evans did not get out of her car. Evans said she would let her insurance company handle it. She gave him her insurance information and told him to contact her insurance company. Traish showed her his driver's license and asked Evans if she had a deductible. Despite his continued attempts to convince her that she had hit him, that she owed him twenty-five dollars for the damage, and that, given her insurance deductible, the easiest thing would be to simply pay him the money, she did not give him any money. Evans described the man who approached her as being either Middle Eastern or Italian, having dark hair, and wearing a black leather jacket. At trial, Evans identified Traish as the man who approached her and accused her of hitting his car, although his hairstyle was different.

On December 26, 1998, Pearl Austin was driving alone in Arlington County, heading home after shopping, when a man in a large, blue Oldsmobile or Chrysler pulled up next to her,

pointed at her car, and said she had hit his car in the store parking lot. Knowing she had not hit anybody in the parking lot or elsewhere, Austin denied having hit the man's car. She got out of her car, however, to see if there was any damage to her car. The man pointed at two marks on her bumper that were not new and told Austin that was where she hit him. Austin explained that the marks had been there for some time and asked him where his car was hit. He pointed to his rear bumper, but she saw no marks on it. At that point, Austin became scared, thinking it was a "shakedown." When the man started walking toward her, Austin, wanting to get away from him, asked him how much it would cost to repair the damage. He responded that it would cost about a hundred dollars. She offered him twenty dollars and asked him to leave her alone. He took the twenty dollars and she left. The encounter lasted less than ten minutes.

Austin described the man who approached her as wearing a dark leather jacket, being either Middle Eastern or Italian, and having a full head of dark, bushy hair. At trial, she did not identify Traish as being that man but instead tentatively picked out a man in the gallery wearing a dark jacket. At the close of the Commonwealth's evidence, the trial court granted Traish's motion to strike as to the charge involving Austin, based on her failure to identify Traish as the perpetrator of the crime.

On January 5, 1999, Corinna Condon, who was nineteen years old, was driving to work by herself in Arlington County at 4:30 p.m. when Traish, driving a dark blue Suzuki Samurai or Jeep-type vehicle with a taped up back window, pulled alongside her at a stoplight and motioned for her to lower her window. When she did, he told her that she had just hit his vehicle. Knowing she had not hit anyone, Condon denied hitting Traish, but pulled over to the side of the road. Traish pulled up behind her, got out of his vehicle, and walked up to her window. He again told her that she had struck his vehicle, and she again denied having done so. When Condon got out of her car, Traish pointed to a cracked taillight and said that was where she hit his vehicle. She continued to deny that she had hit him, and he continued to insist that she had. He said it was going to cost him sixty dollars to get it fixed but, noticing the university sticker on her car, he would give her a break since she was a student and only make her pay fifty dollars for the damage.

Condon again told Traish she had not hit him and added that she was late for work and had to go. He told her she could meet him at the Metro Diner, where he worked and where a cab driver who saw her hit him would join them. He showed her his license and told her his name was "David Trish" or "Shawn Traish." Needing to get to work and not wanting to have to deal with Traish anymore, Condon gave Traish twenty dollars. He saw she had more money in her wallet and asked for thirty dollars, but

she only gave him twenty dollars.  The encounter lasted approximately ten minutes.  After continuing on to work, Condon called the Metro Diner and was told that Traish no longer worked there.

Condon later reported the incident to the police.  Condon told investigators that the man she encountered that day was Middle Eastern, dark haired, and wearing a black leather jacket.  At trial, Condon said Traish was wearing a jean jacket at the time of the encounter.  In connection with the police's investigation, Condon identified Traish's picture from a photo lineup.  She also identified Traish at trial as the man who pulled up beside her and told her she had hit his vehicle.  His hair, she noted, was much shorter than when the incident occurred.

Also on January 5, 1999, Phyllis Hammond, a woman in her seventies, was returning home by herself from the grocery store in Arlington County at 8:30 p.m. when she noticed a vehicle following her very closely.  She pulled over to the side of the road and Traish, driving a dark colored Jeep-like vehicle with a cross-hatching of tape on the rear window, pulled alongside her car, rolled down his window, and told her she had backed into his vehicle in the parking lot of the grocery store and broken his taillight.  Knowing she had not had an accident of any kind in the parking lot, Hammond adamantly denied his claim.  Both drivers then got out of their vehicles, and Hammond saw that

Traish's taillight was cracked.  She denied hitting his vehicle, but asked him how much it would cost to replace a taillight.  He replied that he had recently had the other one fixed for one hundred thirty-eight dollars.  Still saying she had not hit him, she offered him five dollars, which he refused.

When Hammond again denied hitting him, Traish said they could call the police, and she agreed.  He then suggested that he go to a junkyard to find a used replacement and she agreed, saying he could give her the bill.  He replied that he was going to New York the next day and suggested they look at her car to see what damage was done.  He pointed to a strip of rubber on her rear bumper that had been damaged for years and said that was where her car hit his.  Hammond then asked to see his driver's license and saw, when he gave it to her, that his name was Hisham Traish.  She wrote his name, address, phone number, and social security number on a piece of cardboard.

Getting cold, afraid of being car-jacked and of getting hurt, and wanting to get home to care for her ill sister, Hammond then offered Traish ten dollars.  Seeing, when she opened her purse, that she had twenty-five dollars, Traish said he wanted all twenty-five dollars.  She gave him the twenty-five dollars, and he hugged her, saying she reminded him of his mother.  Hammond described the man who pulled alongside her and accused her of hitting his vehicle as being Middle Eastern and

wearing a black leather jacket.  At trial, she identified Traish as that man.

On January 6, 1999, at about 8:15 p.m., Anita Pittman was driving alone in Arlington County when she heard a car honking. Knowing she "hadn't done anything," she thought nothing of it. Shortly thereafter, however, Traish, driving a "boxy," Bronco-type vehicle with tape on it, pulled up beside her and motioned for her to roll down her window.  When she did, he accused her of hitting his vehicle.  Even though she knew she had not hit him, she pulled into a parking lot and got out of her car to look to see if there was any damage.  She saw a mark on her bumper that she had not seen before.  The damage to his vehicle was a cracked taillight, which made her suspicious because it did not correspond to the mark on her car.  He told her his horn did not work, but a cab driver had honked at her. He also said they could call the police but all they would do is have them exchange insurance information.  He suggested he could buy a replacement part at a junkyard for sixty-five dollars. She denied having been in an accident or having hit him.

Traish then told Pittman that she "did not have to be afraid."  Realizing at that point that she "had to get out of there," Pittman told Traish she was not afraid but was cold and needed to go home.  They exchanged names and phone numbers and looked at each other's driver's licenses.  Pittman told him she

would call him and left without giving him any money.  The

encounter lasted approximately fifteen minutes.

Pittman described the man she encountered that night as

being Middle Eastern, having dark hair, and wearing a dark

leather jacket.  At trial, Pittman identified Traish, despite

his different hair cut, as the man who stopped her and accused

her of hitting his vehicle.

Detective Stewart Chase of the Arlington County Police

Department testified that, in investigating a series of reports

of fake accidents involving the same offender and the same

method of operation, he received information of seventeen

similar incidents in Arlington County, and a dozen more in

surrounding jurisdictions, that occurred over a two-month period

beginning in December 1998 and ending with Traish's arrest in

January 1999.  According to Chase,

> the "MO," which is the manner in which an
> offender commits a crime, was very
> consistent.  The physical descriptors of the
> offender were very similar.  The verbiage
> that the person used while interacting with
> the victim was nearly identical in every
> case.  The descriptions of the vehicles that
> the driver was operating were nearly always
> very consistent, although that changed
> because a couple of different vehicles were
> used over the course of those cases.

Chase added that

> what the offender did in all of these cases
> was nearly identical.  He said the same
> things.  He did the same thing.  Many of
> them happened [in] very close proximity to
> the same geographic area . . . .

*　　*　　*　　*　　*　　*　　*

> Particularly early on, it seemed as though all the victims were older women, all victims in the case were women. . . .  The vast majority of the cases involved people, I guess, anywhere from the sixties to the early eighties.

Traish, who put on no testimonial evidence at trial, stood before the jury to allow the jurors to view his physical appearance.

## II.  JOINDER OF OFFENSES

Traish contends the trial court erred in denying his motion to have the cases involving different victims tried separately. Except for the grand larceny and assault and battery offenses, the charges should have been tried separately, he argues, because, although similar in method, they involved different victims, occurred at different times, were not part of the same transaction, and were not part of a plan.  Moreover, Traish contends, he was prejudiced by the joinder of the different offenses at trial because the Commonwealth was able to take advantage of the jury's having heard the joint evidence to implicitly link, and thereby bolster, the obviously weak identity evidence in some cases with the much stronger identity evidence in other cases.  Traish, whose primary defense at trial was misidentification, suggests that, had different juries heard the cases involving the different victims separately, he would

have been acquitted in at least two of the cases where the perpetrator's identity was reasonably in doubt.

The Commonwealth contends that the trial court correctly found that all of the charges for which Traish was indicted involved offenses that were connected or part of a common scheme or plan. Thus, the Commonwealth concludes, the cases were properly tried together under Rules 3A:10(c) and 3A:6(b). We agree with the Commonwealth.

Rule 3A:10(c) permits the trial of multiple offenses committed by one defendant "if justice does not require separate trials and . . . the offenses meet the requirements of Rule 3A:6(b)." Rule 3A:6(b) permits the joinder of offenses "if the offenses are based on the same act or transaction, or on two or more acts or transactions that are connected or constitute parts of a common scheme or plan." "Whether different offenses should be tried separately is a matter that rests within the sound discretion of a trial court. Thus, a trial court's ruling on the matter will not be reversed absent a showing that the court abused its discretion." Ferrell v. Commonwealth, 11 Va. App. 380, 386, 399 S.E.2d 614, 617 (1990).

The question before us, then, is whether the record discloses that the trial court abused its discretion in refusing to sever the offenses for trial. See id. We discern nothing in the record to indicate that the trial court abused its discretion.

The evidence and the reasonable inferences to be drawn therefrom clearly support a finding that the offenses for which Traish was indicted constituted parts of a common scheme to systematically bilk women drivers and were closely connected in the distinctive means of their commission. In all of the charged offenses, Traish approached women who were driving alone. Generally, the women were elderly, although one was a teenager. He honked his horn at them and attempted to get them to pull over. When they pulled over or reached their destination, Traish told the women, always using the same general language, that they had collided with him and damaged his vehicle. He pointed to the alleged damage on his vehicle and pointed out marks on the victims' cars in an attempt to convince them they had struck his vehicle. To reduce their suspicions, Traish commonly offered to show his operator's license to the women as a sign of his sincerity. He then discussed the cost of fixing the damage and, in all but one case where his efforts were cut short by the approach of someone offering to help the victim and another where he simply ran off with the victim's wallet, asked the victims for money for the repairs. In each instance, Traish wore a black leather jacket. Over the course of the twenty-two-day crime spree, which ended with Traish's arrest, Traish drove two vehicles: an older, large, blue sedan and a Jeep-like vehicle. Furthermore, the offenses all occurred in the same general geographic location.

Thus, the offenses met the requirements of Rule 3A:6(b) for a single trial. Moreover, justice did not require separate trials for the offenses because, if the offenses were, as Traish requested, tried separately, evidence of the other offenses would have been admissible to prove the perpetrator's identity.

At trial, the identity of the perpetrator was the primary issue in dispute. Even though evidence of other offenses is generally inadmissible in a criminal prosecution, evidence of other criminal conduct is admissible to prove "the perpetrator's identity when 'some aspects of the [other criminal conduct] are so distinctive or idiosyncratic that the fact finder reasonably could infer that the same person committed both crimes.'" Shifflett v. Commonwealth, 29 Va. App. 521, 529, 513 S.E.2d 440, 444 (1999) (quoting Guill v. Commonwealth, 255 Va. 134, 138-39, 495 S.E.2d 489, 491 (1998)). Such evidence must be excluded, however, if the prejudicial effect of the evidence outweighs its probative value, a determination within the sound discretion of the trial court. Id. Furthermore, such evidence is admissible regardless of whether the other criminal conduct occurred before or after the commission of the offense for which the defendant is being tried. See Collins v. Commonwealth, 226 Va. 223, 230, 307 S.E.2d, 884, 888 (1983).

In light of the distinctive method of operation that, as noted above, was employed in each of the instant crimes, we conclude that a fact finder reasonably could infer that the same

person committed all of the charged offenses. Furthermore, given Traish's claim that he was not the person who committed the offenses, the probative value of the evidence of the other offenses is obvious, and we cannot say that a trial court abuses its discretion by finding that the probative value outweighed the prejudicial effect of such evidence.

Hence, the offenses also met the requirements of Rule 3A:10(c) for a single trial. We hold, therefore, that the trial court did not abuse its discretion in denying Traish's motion for separate trials.

### III. SUFFICIENCY OF THE EVIDENCE

Traish also contends the Commonwealth's evidence was insufficient as a matter of law to prove beyond a reasonable doubt that he was the person who committed the offenses of grand larceny and assault and battery against Helen Lyon. Lyon's photo-array and in-court identifications of Traish were, Traish argues, rendered unreliable by her failure to initially identify Traish as the perpetrator at the preliminary hearing, by her testimony at the preliminary hearing that the perpetrator was of "average build, maybe a little bit on the slender side," and by her testimony at trial that there was a "long last name" on the driver's license shown to her by the perpetrator.

When the sufficiency of the evidence is challenged on appeal, we must consider the evidence "in the light most favorable to the Commonwealth, granting to it all reasonable

inferences fairly deducible therefrom."  Bright v. Commonwealth, 4 Va. App. 248, 250, 356 S.E.2d 443, 444 (1987).  "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995).  We will not reverse a conviction unless "it appears from the evidence that it is plainly wrong or without evidence to support it."  Sutphin v. Commonwealth, 1 Va. App. 241, 243, 337 S.E.2d 897, 898 (1985).

Here, the sufficiency of the evidence depends on the reliability of Lyon's identification of Traish as the perpetrator.  See Smallwood v. Commonwealth, 14 Va. App. 527, 530, 418 S.E.2d 567, 568 (1992).  Factors determining the reliability of an identification include "'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.'"  Townes v. Commonwealth, 234 Va. 307, 331, 362 S.E.2d 650, 663-64 (1987) (quoting Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).

We find that, in considering the totality of the circumstances set forth in the record before us, no substantial likelihood of misidentification existed in this instance.  See

Neil, 409 U.S. at 198-99. Lyon had the opportunity to view the perpetrator at close range, outdoors, in the daylight, for a considerable time. Lyon's attention was not distracted by any threats or displays of a weapon by the perpetrator. Likewise, her vision was not impaired. Shortly after the incident, Lyon gave the police a description of the perpetrator, including his approximate height and age and the style and extent of his facial hair, features which were not disputed by the defense. She also said he was wearing a black leather jacket.

Lyon then selected Traish's picture from a photo array during the police's investigation of the incident. At the preliminary hearing, Lyon initially identified another man as the perpetrator based on his attire, but corrected her identification when, after standing up, she saw Traish in the courtroom. She identified Traish, unlike the first man, on the basis of his facial appearance. At trial, she identified Traish and testified she had "no doubt" he was the man who assaulted her and stole her wallet. The reliability of Lyon's identification of Traish was further supported by Traish's proven connection to the other offenses that were committed as part of the same scheme or plan as the subject crimes involving Lyon.

As for Traish's claim that Lyon's description of the perpetrator as being of "average build, maybe a little bit on the slender side" tainted her identification of Traish, our

review of the record convinces us that this contention is without merit. No evidence in the record suggests that Lyon's description of the perpetrator's build was not credible. Indeed, the only other evidence in the record regarding Traish's build is the testimony by Mary Jane Evans that the man who accused her of hitting his car had a "medium build." Evans identified Traish in court as that man. "Average build, maybe a little bit on the slender side," and "medium build" are entirely consistent descriptions. Moreover, the jury, who had the opportunity to observe Traish's build when he stood before them and removed his jacket, was entitled to compare Lyon's description with Traish's physical appearance and weigh Lyon's credibility accordingly. See Sandoval, 20 Va. App. at 138, 455 S.E.2d at 732. The jury found Lyon's testimony credible.

So, too, was it the jury's province to weigh and resolve possible conflicts in and judge the credibility of Lyon's testimony regarding the driver's license shown to her by the perpetrator. See id. Looking at the totality of the circumstances and given the strength of the evidence supporting the reliability of Lyon's identification, we cannot say as a matter of law that Lyon's testimony that the "last name" on the license was "long" rendered Lyon's identification of Traish unreliable. Because the license was "shiny," Lyon could not identify the picture on it and establish that it was even Traish's license. Nor could she recall the name on it. Indeed,

it is not clear from the record whether by "last name" Lyon meant the operator's surname or the name literally appearing last in the list of individual names on the license, which, as there was no evidence regarding the order of names on the license, could have been the operator's first or middle name.

We conclude, therefore, that the jury could find beyond a reasonable doubt, on the basis of the evidence presented, that Traish was the man who committed the crimes of grand larceny and assault and battery against Lyon. The jury's determination was supported by ample credible evidence and was not plainly wrong. Accordingly, the trial court did not err in denying Traish's motion to strike the evidence on the grand larceny and assault and battery charges.

## IV. FATAL VARIANCE

Traish further contends that, even though he was indicted and convicted of attempted petit larceny, the offense of completed larceny was proven in the cases involving Corinna Condon and Phyllis Hammond, both of whom gave Traish money. Consequently, his argument continues, he could later be prosecuted again on the same evidence for completed larceny. Thus, he concludes, the variance between the allegation of the indictments and proof of the crimes was fatal and he cannot, therefore, be convicted of the offenses charged in those indictments.

Traish's fatal variance complaint is without merit.

> It is true that a variance between the allegations of an indictment and proof of the crime may be "fatal," and "[t]he offense as charged must be proved." A variance is fatal, however, only when the proof is different from and irrelevant to the crime defined in the indictment and is, therefore, insufficient to prove the commission of the crime charged.

Hawks v. Commonwealth, 228 Va. 244, 247, 321 S.E.2d 650, 651-52 (1984) (alteration in original) (citations omitted).

Here, even though Condon and Hammond both gave Traish money, the evidence did not prove the offense of completed larceny. "Larceny is the wrongful taking of the goods of another without the owner's consent and with the intention to permanently deprive the owner of possession of the goods." Bright, 4 Va. App. at 251, 356 S.E.2d at 444. Larceny by false pretenses requires proof that, inter alia, the false pretenses used by the perpetrator to perpetuate a fraud "induced the owner to part with his property." Bourgeois v. Commonwealth, 217 Va. 268, 272, 227 S.E.2d 714, 717 (1976). Thus, proof of a completed larceny in the present cases would have required a showing that Traish wrongfully took money from Condon and Hammond without their consent or by inducing them by false pretenses to give him their money.

The evidence, however, proved that the women voluntarily gave Traish the money. Neither Condon nor Hammond believed Traish's false claims that they had hit his vehicle and owed him money to pay for the damage. Condon gave Traish money merely to

get rid of him because she was late for work and had to leave. Hammond gave him money because she was getting cold, was afraid of being car-jacked, and wanted to get home to care for her ill sister. Thus, there was no taking of property by false pretenses or without the owner's consent.

Hence, the proof at trial would not have sustained convictions for completed larcenies, but did conform to the attempted petit larceny indictments. Accordingly, the trial court did not err in ruling there was no fatal variance in the subject indictments.

### V. THE DEFENSE OF LEGAL IMPOSSIBILITY

Finally, Traish contends that, based on the evidence presented in the cases, the larcenies attempted were legally impossible because the victims were not deceived by his false claims that they had hit his vehicle. Because the victims did not believe him, even if the offenses had been fully carried out exactly as intended, there would have been, Traish argues, no nonconsensual transfer of property or inducement of the victims by false pretenses to give Traish money. Thus, under the doctrine of legal impossibility, he could not, he argues, properly be convicted on the attempted petit larceny charges.

Traish's argument is without merit. "Legal impossibility occurs when a defendant's actions, even if fully carried out exactly as he intends, would not constitute a crime." Parham v. Commonwealth, 2 Va. App. 633, 636, 347 S.E.2d 172, 173 (1986).

"'An attempt is composed of two elements: the intention to commit the crime, and the doing of some direct act towards its consummation which is more than mere preparation but falls short of execution of the ultimate purpose.'" Hopson v. Commonwealth, 15 Va. App. 749, 752, 427 S.E.2d 221, 223 (1993) (quoting Sizemore v. Commonwealth, 218 Va. 980, 983, 243 S.E.2d 212, 213 (1978)). "'[I]n order to constitute an attempt[,] the act attempted must not be impossible, but this rule has reference to inherent impossibility, and not to cases where the impossibility has been brought about by outside interference, or grows out of extraneous facts not within the knowledge and control of the accused.'" Parham, 2 Va. App. at 636, 347 S.E.2d at 174 (quoting Collins v. Radford, 134 Va. 518, 536, 113 S.E. 735, 741 (1922)).

Here, the evidence established that, regardless of whether the victims believed Traish's misrepresentations or not, it was Traish's intent to obtain money from the victims by means of false pretenses. In each case, he committed direct acts toward the consummation of that crime by approaching the victims and telling them they had hit and damaged his vehicle. While none of the victims gave Traish money believing they had hit his car, meaning the larcenies were not completed, Traish's actions, if fully carried out exactly as he intended, would have constituted the crime of larceny by false pretenses. Traish completed every act necessary for the commission of the substantive crime. The

only reason the commission of the larcenies was not completed was the victims' lack of gullibility, a fact that was unknown to Traish and beyond his control.

Hence, the instant crimes of attempted petit larceny were not legally impossible. Thus, the trial court did not err in denying Traish's motion to strike the evidence as to the attempt cases on the ground of legal impossibility.

For these reasons, Traish's convictions are affirmed.

<u>Affirmed.</u>