UNPUBLISHED

# COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Malveaux and Senior Judge Annunziata
Argued at Alexandria, Virginia


JOANNA DENISE BENJAMIN GIBSON

MEMORANDUM OPINION* BY
v.        Record No. 0986-18-4          JUDGE MARY BENNETT MALVEAUX
JULY 23, 2019

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
James C. Clark, Judge

Elizabeth Tuomey (Tuomey Law Firm, PLLC, on briefs), for
appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Joanna Denise Benjamin Gibson ("appellant") was convicted of contributing to the

delinquency of a minor, in violation of Code § 18.2-371(i), making a false report of child abuse or

neglect, in violation of Code § 63.2-1513, and giving a false report to a law enforcement official, in

violation of Code § 18.2-461.  On appeal, she argues that the evidence was insufficient to prove:

(1) the charge of contributing to the delinquency of a minor, because there was no evidence

presented of the child's physical or mental injury to support a finding of abuse; (2) the charge of

making a false report of child abuse, because she did not both make and cause to be made a false

report of child abuse, as required under count two of the indictment; (3) the charge of making a false

report of child abuse, as no evidence was presented that she made a false report; and (4) all three

offenses, as the circumstantial evidence did not exclude every reasonable hypothesis of innocence.

For the following reasons, we affirm.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

I.  BACKGROUND

"In accordance with established principles of appellate review, we state the facts in the light most favorable to the Commonwealth, the prevailing party in the trial court," and "accord the Commonwealth the benefit of all inferences fairly deducible from the evidence."  Riner v. Commonwealth, 268 Va. 296, 303 (2004).

Appellant and Ernest Jean-Francois were married in December 2010.  Their daughter, A.F., was born in October 2011.

In October 2016, as a result of a domestic incident between appellant and Jean-Francois, appellant was arrested.  While the charge was pending, appellant "begged" Jean-Francois not to testify against her.  Jean-Francois did not testify against appellant at her April 7, 2017 criminal trial, and as a result of his refusal to testify, the charge against appellant was dismissed.

Jean-Francois separated from appellant after the October 2016 incident, and appellant filed for divorce a month later.  During the separation, appellant continued to live in Maryland while Jean-Francois had moved to Alexandria.  A.F. lived with appellant during this time.  Initially, there was a period of six weeks where appellant did not allow Jean-Francois to see A.F., but he was later awarded court-ordered visitation.  Because Jean-Francois' work with the White House Communications Agency involved travel, the parties agreed that Jean-Francois would have one overnight visitation per month, and when he was not traveling he would have visitation with A.F. every Saturday "[f]or a few hours."  In early 2017, Jean-Francois had overnight visitation with A.F. the night of March 4, daytime visitation the day of March 11, overnight visitation the night of April 1, and daytime visitation the day of April 8.

On the morning of April 8, the day after dismissal of appellant's domestic case, appellant sent Jean-Francois several text messages.  One message stated that appellant had "br[oke] into" Jean-Francois' Facebook account and seen a conversation he was having about the date of his

retirement. In relation to this conversation, appellant told Jean-Francois, "hah . . . we'll see, you have no idea what's coming." Appellant also messaged him, "You are about to get CLAWS on you soon," and "[y]ou have no clue what's in store." Appellant sent him a text stating, "pedo," which Jean-Francois understood to mean pedophile.

Around 10:30 a.m. that same day, Jean-Francois picked up A.F. and took her back to his apartment. He showed her on his phone where he would soon be traveling, and she was upset about how long he would be gone. He returned A.F. to appellant around 4:30 p.m., and when he was leaving A.F. hugged Jean-Francois and cried because she did not want him to leave. He testified that he did not sexually abuse or assault A.F. on April 8 or at any other time.

On April 13, appellant took A.F. to the doctor's office, where A.F., who was five years old at the time, made a report of sexual abuse by Jean-Francois. The doctor contacted Alexandria Child Protective Services ("CPS"), which started a joint investigation with the Alexandria Police Department. That same day, appellant took A.F. to the Center for Alexandria's Children ("the CAC"). At the CAC, appellant reported to Detective Douglas Quint of the Alexandria Police Department and CPS employee Le'Vaughn Westbrook that on the previous day, April 12, A.F. had told her that Jean-Francois had touched A.F.'s "private area" during a recent visit. Appellant stated that while she was bathing A.F., a television commercial about prevention of child sexual abuse had aired, and in response A.F. told her about being touched by Jean-Francois. Appellant stated that A.F. told her that "bad touch" was "when daddy touches my private area, it makes me sad." Westbrook testified that appellant's demeanor was "calm" while she reported the incident to her. Appellant told Wesbrook that Jean-Francois' last overnight visit with A.F. had occurred on April 1, and his last daytime visit had occurred on April 8.

Appellant informed Quint and Westbrook that she had asked A.F. questions about the touching and recorded parts of their conversation using FaceTime. Appellant also stated that she had recorded some of A.F.'s conversations with other family members, including appellant's mother and her adult daughter. Appellant provided these video recordings to the police, and the recordings were admitted as evidence at trial. Detective Quint testified at trial that the questions posed to A.F. by appellant's adult daughter were "very leading and . . . very suggestive" and that he was concerned that A.F.'s repeated questioning by family members about the purported abuse could be "traumatizing."

While at the CAC on April 13, an employee conducted a forensic interview with A.F. A video recording of this interview was entered into evidence at trial. In the interview, when A.F. was asked about her father, she immediately stated, "Well, Daddy sometimes -- when it was my first day going to Daddy's house, and he -- and when I had a sleepover with him, sometimes he touches my private and it gives me pain." A.F. told the interviewer that, "the first time it happened we had a sleepover, and then when it was the middle of the night he started touching my private. So he didn't put anything in it, but he just touched it, then he smelled his finger." When asked how this felt, A.F. said it was "Very painful and stuff." A.F. initially told the interviewer that Jean-Francois had touched her privates with his finger three times, but then denied that he had abused her on a third occasion. She also said that Jean-Francois had digitally penetrated her "bottom" more than once. A.F. stated that she told appellant about the abuse "[b]ecause Daddy told me to tell everybody . . . because he wanted to say sorry for putting his hands in my private."

After the interview, A.F. was taken to a hospital for a sexual assault nurse examination ("SANE"). Detective Quint testified that the SANE conducted on April 13 "was not an acute exam" because the reported sexual assaults were not sufficiently recent. Rather, it was "more of

- 4 -

a physical kind of checkup," intended to note "anything that's odd, any damages, anything that shouldn't be [evident] at her age." When Quint had asked the nurse examiner after the examination if there was "anything [he] should worry about," the nurse examiner had responded, "[N]o, everything was okay."

In May 2017, during the police investigation of the child abuse allegation, Jean-Francois received an anonymous email that he forwarded to Detective Quint. The email was from "protonmail.com," a server that creates email accounts that disappear after ten minutes. The email stated that his "best option" was to "end the marriage through mediation as soon as possible." The email contained a list of Jean-Francois' "legal issues," including "[c]hild [s]exual [a]buse [a]llegations." It also stated that because of his "non-settlement" of his divorce, a "strong case [was] being built against" him. The email further suggested that a "press tip-off" of his "case" would end his career, regardless of whether or not he was found guilty.

During the course of the investigation, Detective Quint spoke to appellant's mother, Barbara Benjamin, who contradicted the timeline of abuse that appellant had provided to Quint. When appellant learned that her mother had provided Quint with information inconsistent with her account, appellant called Quint and said that her mother "was confused." When the detective spoke with Barbara Benjamin a second time, she gave an account that was consistent with her first conversation with Quint and again inconsistent with appellant's account.

At Detective Quint's request, appellant gave him her cell phone for forensic evaluation. Martin Hoffmaster, a forensic examiner with the Alexandria Police Department, located a twelve-minute audio file labeled "DD" on the phone. He was able to determine that the file was created on April 11, 2017, a day prior to when appellant alleged that A.F. had reported the abuse to her.

The "DD" audio file begins with appellant's voice stating,

>Let go completely and totally to my voice and follow all of my
>instructions. Start by slowly breathing in deeply through your
>nose. Hold your breath for a moment, and now breathe out
>through your mouth. Take a deep breath in and a deep breath out.
>You feel yourself relaxing, you feel so very good.
>
>Let go of all of your thoughts. Keep watching the swirl, don't look
>away. With each breath in and out, let your mind go of all
>thoughts and feel relief. Let it go away and relax deeper, deeper,
>deeper. Notice that your breathing is slower and deeper, and you
>are so relaxed.

The audio file continues with appellant giving similar instructions for several minutes.

Appellant then says

>Relax your mind. Your mind is so warm that you are going to let
>go to my voice. Your mind is at your daddy's house. Your mind
>can see Daddy's bedroom. Daddy touches your private area with
>his fingers while you sleep. Daddy is touching his private area too.
>Daddy's private area is getting big.
>
>Daddy is a bad man. You feel sad. You want to go deeper into
>sleep. Let go. Your mind will stay in Daddy's bedroom. Daddy
>touches your private areas with his fingers while you sleep. Daddy
>is touching his private area too. It is getting big. Daddy is a bad
>man. You feel sad.

Appellant repeats these commands for several minutes and also instructs the listener to inform

teachers, "Grandma Barbara," and "everyone what Daddy does." Detective Quint noted at trial

that during the forensic interview, A.F. repeated some of the "exact words" recited by appellant

in the "DD" audio file.

A second audio file located on appellant's phone, labeled "MM," was in the "same

format" as the "DD" audio file, but instead of using the word "daddy," this recording uses the

word "Mickey Mouse." Appellant commands the listener to tell a teacher, Grandma Barbara,

and "everyone" that she wants to see Mickey Mouse.

Detective Quint also discovered a "Note" on appellant's phone containing the phrases "ten minute mail . . . self-destruct, auto-delete email." He also discovered another "Note," titled "Haitian White House Communications Agency Soldier Corrupt," that contained information substantially similar to the contents of the May 2017 protonmail.com email received by Jean-Francois. Quint also found deleted files on appellant's phone labeled "hypnosiscutversion.mp4" and "Slave Hypnosis Brainwashing Sauna," as well as a deleted file containing a "hypnotic spiral image." When Quint searched the internet for "Slave Hypnosis Brainwashing Sauna," he found a YouTube video that was very similar in its contents to the "DD" file.

On June 8, 2017, Detective Quint had two phone conversations with appellant. During the first conversation, Quint asked her about the "DD" file found on her phone. Appellant admitted that she had made the recording, and stated that she had done so because she did not want "a case that's 10, 12, 11 months down the line, and [A.F.] forgets about it or something happens on there." She also told Quint that she had never played the audio for A.F. Appellant claimed that the hypnosis image was on her phone because she wanted to use hypnosis for weight loss. A few minutes after this conversation, appellant called Quint back and told him that she "felt a little bit uncomfortable, because it seemed like all of the questions just focused on negative stuff about [her]." She told Quint that if the "DD" file was created on April 11, before A.F.'s alleged abuse, she might have had the "timeline" wrong.

Following appellant's arrest in June 2017, an examination of her phone revealed that several files had been deleted since the previous police examination. According to Hoffmaster, the deleted files included the "slave hypnosis files, the Hypnosis Cut Version, . . . , [and] the three movies that [appellant] provided Detective Quint."

Giselle Pelaez, the executive director of the CAC, was qualified at trial as an expert in forensic interviewing, child development, memory, and suggestibility. She testified that suggestibility is the degree to which memory "is influenced by social and emotional things that are happening around" a child, and explained that a child under the age of six would be more susceptible to suggestion than older children. Pelaez stated that multiple interviews of a child might change his or her memory of an event and promote suggestibility. Further, the "factors that might have taken place just prior to or have been promised post an event may increase suggestibility of that child," such as the promise of a reward or a punishment. Palaez also testified that statements that are "the same every time" they are made and statements of facts unaccompanied by expected emotions or changes in affect are also indications of suggestion.

During the course of his investigation, Detective Quint did not observe A.F. cry or exhibit any fear when she was around Jean-Francois. Jean-Francois testified at trial that A.F. was currently "doing great" and "pretty happy." He did have "to take her to counseling."

Appellant did not present any evidence. Appellant moved to strike the evidence on all of the charged offenses.[1] After hearing argument from the parties, the court stated that "all of the evidence is purely circumstantial" but "likewise, at least in my mind, overwhelming and l have no doubt that [A.F.] was subjected to either the audio produced in DD or for some iteration of it that caused her to provide a fabricated version of abuse attributed to her father." Based upon its finding, the court found that the evidence was sufficient to find appellant guilty of making a false report about abuse or neglect, in violation of Code § 63.2-1513, and giving a false report to a law enforcement official, in violation of Code § 18.2-461. As for the charge of contributing to the delinquency of a minor, in violation of Code § 18.2-371(i), it found that

---

[1] The trial court granted a motion to strike a charge of child cruelty under Code § 40.1-103.

- 8 -

the statute has a number of different parts one of which says that one can be convicted of what I'll call contributing by act or omission. In this case it's very clear to me that at the very least there was an omission by [appellant] in this case which caused her daughter to be abused and neglected as defined in [Code § 16.1-228] and at the very least through the mother's silence knowing the child fabricated a story of abuse she caused the child to be subjected to SANE exam and a forensic interview which caused her to have to regurgitate what she knew was a fantasy abuse by the mother. And so I think that there's clear evidence to prove beyond a reasonable doubt she's guilty on count 3.

This appeal followed.

## II. ANALYSIS

### A. Standard of Review

When reviewing the sufficiency of the evidence to support a criminal conviction, we "'consider the record in the light most favorable to the Commonwealth, giving it all reasonable inferences fairly deducible' from that record." Miller v. Commonwealth, 64 Va. App. 527, 536 (2015) (quoting DeAmicis v. Commonwealth, 31 Va. App. 437, 440 (2000) (*en banc*)). "In doing so, the Court discards 'the evidence of the accused in conflict with that of the Commonwealth, and regard[s] as true all the credible evidence favorable to the Commonwealth.'" Id. (alteration in original) (quoting DeAmicis, 31 Va. App. at 440).

When the sufficiency of the evidence is challenged on appeal, we do not disturb the conviction "unless it is plainly wrong or without evidence to support it." Smith v. Commonwealth, 296 Va. 450, 460 (2018) (quoting Commonwealth v. Perkins, 295 Va. 323, 327 (2018)). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Phillips v. Commonwealth, 56 Va. App. 526, 534-35 (2010) (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257 (2003) (*en banc*)). "If there is evidence to support the convictions, the reviewing court is not permitted to substitute its own

judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." Synan v. Commonwealth, 67 Va. App. 173, 185 (2017) (quoting Courtney v. Commonwealth, 281 Va. 363, 366 (2011)).

### B. Contributing to the Delinquency of a Minor

Appellant first challenges the sufficiency of the evidence of her conviction for contributing to the delinquency of a minor. She argues that the trial court's finding that there was an omission by her which caused A.F. to be abused or neglected as defined in Code § 16.1-228 was in error, as there was no evidence that A.F. received any physical or mental injury as required by the statute.

We need not address this argument because we affirm the circuit court's judgment, although with different legal reasoning. "When appellate courts affirm, they 'enforce not a [lower] court's reasoning, but the court's *judgment*.'" Rickman v. Commonwealth, 294 Va. 531, 542 (2017) (alteration in original) (quoting Alexandria Redev. & Hous. Auth. v. Walker, 290 Va. 150, 156 n.1 (2015)). Thus, "[u]nder the right result for the wrong reason doctrine, 'it is the settled rule that how[ever] erroneous . . . may be the reasons of the court for its judgment upon the face of the judgment itself, if the judgment be right, it will not be disturbed on account of the reasons." Perry v. Commonwealth, 280 Va. 572, 579 (2010) (second and third alterations in original) (quoting Schultz v. Schultz, 51 Va. (10 Gratt.) 358, 384 (1853)). "Though often called the right-result-wrong-reason doctrine, the underlying idea is better described as the right-result-*different*-reason doctrine in cases, such as this one, in which we express no view on the correctness of the lower court's rationale." Rickman, 294 Va. at 542.

"[C]ases are only proper for application of the right result for the wrong reason doctrine when the evidence in the record supports the new argument on appeal, and the development of additional facts is not necessary." Perry, 280 Va. at 579; see also Spinner v. Commonwealth,

___ Va. ___, ___ (May 30, 2019) ("The doctrine has a limitation. It does not apply unless the record on appeal fully supports the appellee's argument on appeal."). "Furthermore, an appellate court's 'examination is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling.' Rather, 'an appellate court must consider all the evidence admitted at trial that is contained in the record.'" Perry, 280 Va. at 580 (citation omitted) (quoting Bolden v. Commonwealth, 275 Va. 144, 147 (2008)). "[T]he proper focus of the application of the doctrine" is "[c]onsideration of the facts in the record and whether additional factual presentation is necessary to resolve the newly-advanced reason." Id.

Code § 18.2-371 provides in pertinent part as follows:

> Any person 18 years of age or older, including the parent of any child, who (i) willfully contributes to, encourages, or causes any act, omission, or condition that renders a child delinquent, in need of services, in need of supervision, or abused or neglected as defined in § 16.1-228 . . . is guilty of a Class 1 misdemeanor.

The "or" is disjunctive; thus, one is guilty of contributing to the delinquency of a minor if they render a child (1) delinquent, (2) in need of services, (3) in need of supervision, or (4) abused or neglected.[2]

In this case, the facts in the record before the trial court fully established, without the need for any additional fact-finding, that appellant rendered A.F. delinquent. Therefore, we do not address the trial court's conclusion that "at the very least there was an omission by [appellant] in this case which caused her daughter to be abused and neglected."

Code § 16.1-228 defines "delinquent child" as "a child who has committed a delinquent act." The statute further defines "delinquent act" as, among other things, "an act designated a crime under the law of the Commonwealth, or an ordinance of any city, county, town or service

---

[2] We note that all of the several disjunctive elements enumerated in Code § 18.2-371 were charged in the subject indictment.

- 11 -

district, or under federal law." As recited above, Code § 18.2-371 provides that any individual who "willfully contributes to, encourages, or causes any act, omission, or condition that renders a child delinquent" is guilty of contributing to the delinquency of a minor.

By the statute's clear language, an individual who willfully contributes to, encourages, or causes a child to engage in a criminal activity, where the child actually commits the crime, has committed the offense of contributing to the delinquency of a minor. The evidence in the record fully established that appellant did so in the instant case. A rational fact finder could conclude, as the trial court did, that appellant caused A.F. to falsely report sexual abuse by her father when she hypnotized A.F. using the "DD" file found on her cell phone. Appellant further reinforced the abuse allegations by encouraging A.F. to discuss them with her mother and her elder daughter. Appellant also facilitated A.F.'s disclosure of the abuse to Detective Quint and CPS and provided Quint with FaceTime videos showing A.F. stating the false allegation. Appellant's actions caused A.F. to falsely report sexual abuse, a criminal act under the laws of Virginia. Thus, appellant's actions rendered A.F. delinquent.[3] Based upon this determination, we find that the evidence was sufficient to support appellant's conviction for contributing to the delinquency of a minor, albeit for a reason not articulated by the trial court.

---

[3] Appellant contends that A.F. could not have been rendered delinquent because she was five years old at the time of the false report and children under seven years old are "'conclusively presumed to be incapable of crime, and no evidence can be received to rebut the presumption.'" We reject appellant's argument that the common law defense of infancy somehow precludes her actions from constituting the crime of contributing to the delinquency of a minor. The fact that A.F. is not legally culpable of the offense does not negate the fact that she actually carried out the act of making a false report of sexual abuse, a criminal offense in Virginia notwithstanding any legal defense available to her. See Code § 16.1-228 (defining delinquent act as "(i) an act designated a crime under the law of this Commonwealth, or an ordinance of any city, county, town or service district, or under federal law").

C. <u>False Report of Child Abuse/False Report to Law Enforcement</u>[4]

Appellant further argues that the trial court erred in finding the evidence sufficient to convict her of making a false report of child abuse and giving a false report to law enforcement.

Code § 63.2-1513(A) provides, "Any person fourteen years of age or older who makes or causes to be made a report of child abuse or neglect pursuant to this chapter that he knows to be false shall be guilty of a Class 1 misdemeanor."

Appellant was found guilty of making a false report of child abuse under an indictment alleging as follows:

> On or between the 11th day of April, 2017, and the 13th day of April, 2017, in the City of Alexandria, Virginia, JOANNA DENISE BENJAMIN-GIBSON, a person fourteen years of age or older, did unlawfully make and cause to be made a report of child abuse that she knows to be false. VIRGINIA CODE § 63.2-1513.

Clearly, the statute punishes an individual who either "makes *or* causes to be made" a false report of child abuse. (Emphasis added). However, the indictment in this case is in the conjunctive, alleging that appellant "did unlawfully make *and* cause to be made" a false report of child abuse. (Emphasis added). Appellant argues that the Commonwealth is bound by the language of the indictment and that there was no evidence that appellant made a false report; rather, the evidence showed that A.F. made the false report.

However, regardless of whether we accept appellant's argument, appellant does not prevail as the evidence clearly established that appellant "did unlawfully make *and* cause to be made" a false report of child abuse. We determine so because in this case, A.F. acted as an innocent agent for appellant, who was therefore guilty of the offense as a principal in the first degree.

---

[4] This section addresses appellant's second and third assignments of error.

Virginia law provides that "one who effects a criminal act through an innocent or unwitting agent is a principal in the first degree." Bailey v. Commonwealth, 229 Va. 258, 262 (1985). "[T]he doctrine of innocent agent . . . allows a defendant not present at the commission of the crime to be convicted as a principal in the first degree, if the defendant engaged in actions which caused the actual perpetrator to commit the crime as an innocent agent of the defendant." Gallimore v. Commonwealth, 246 Va. 441, 446 n.1 (1993). "The innocent agent is 'innocent' because he or she is a child, or is mentally incompetent, or otherwise does not have the requisite criminal state of mind." Id. "[A] defendant may not escape criminal responsibility for a crime which he arranges to have committed by an unwitting agent." Collins v. Commonwealth, 226 Va. 223, 233 (1983).

In the instant case, the record supports the finding that appellant manufactured the sexual abuse allegations, used hypnosis to implant the allegations in her innocent and unwitting daughter's memory, encouraged her daughter to practice telling the lies, and then facilitated A.F.'s ability to report the false allegation to a CPS investigator. Thus, there was sufficient evidence for the trial court to conclude that appellant, acting as a principal in the first degree, did unlawfully make and cause to be made a false report of child abuse.

Appellant further argues that the evidence was insufficient to sustain her conviction for making a false report of child abuse.

Code § 18.2-461 provides that it is unlawful for "any person . . . to knowingly give a false report as to the commission of any crime to any law-enforcement official with intent to mislead."

As she did with respect to the false report of child abuse offense, appellant argues here that the evidence demonstrated that A.F. gave the report of child abuse to police. Therefore, according to appellant, because she merely informed law enforcement of what A.F. had stated to

her, the evidence was not sufficient to prove that she committed the offense of giving a false report to law enforcement.

However, the factual record belies appellant's contention. Here, the evidence showed that appellant took her daughter to the doctor's office, where A.F. made a report of sexual abuse by Jean-Francois. After visiting the doctor, appellant took A.F. to the CAC, where appellant *herself* reported to Detective Quint and a CPS investigator that on the previous day, A.F. had told her that Jean-Francois had touched her "private area" during a recent visit. Appellant also informed Detective Quint that she and other family members had asked A.F. questions about the touching and recorded parts of these conversations with FaceTime, and appellant provided these recordings to the police. The trial court found that appellant "subjected" A.F. "to either the audio produced in DD or . . . some iteration of it that caused her to provide a fabricated version of abuse attributed to her father," a factual finding that is not plainly wrong or without evidence. Thus, at the time when appellant repeated A.F.'s allegation to Detective Quint, she knew that the report was false. Based upon the factual findings of the court and the evidence adduced at trial, it is clear that appellant *herself* knowingly gave a false report as to the commission of a crime to a law enforcement official with intent to mislead.

We also reject appellant's reasoning—that she could not have committed the offense because A.F. was the one who reported the crime—on the same basis as we did her argument concerning the false report of child abuse offense. Here, the false report to law enforcement was the result of appellant using A.F. as her innocent and unwitting agent. Because appellant engaged in actions which caused A.F. to commit the crime as an innocent agent of appellant, she was guilty of giving a false report to law enforcement as a principal in the first degree.[5]

---

[5] Appellant further argues there was not sufficient evidence to support her convictions for making a false report of child abuse and giving a false report to law enforcement because the Commonwealth's evidence affirmatively showed that A.F. made a statement alleging abuse by

## D. Reasonable Hypothesis of Innocence

Appellant further argues that the trial court erred in finding the evidence sufficient to sustain all three offenses because the circumstantial evidence did not exclude every reasonable hypothesis of innocence.

"Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." Holloway v. Commonwealth, 57 Va. App. 658, 665 (2011) (*en banc*) (quoting Coleman v. Commonwealth, 226 Va. 31, 53 (1983)). However, the Commonwealth is "not required to exclude every possibility" of the appellant's innocence but, rather, "only . . . hypotheses of innocence that flow from the evidence." Dowden v. Commonwealth, 260 Va. 459, 468 (2000). "The reasonable-hypothesis principle . . . is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'" Commonwealth v. Moseley, 293 Va. 455, 464 (2017) (quoting Commonwealth v. Hudson, 265 Va. 505, 513 (2003)). The reasonableness of "an alternate hypothesis of innocence" is itself a question of fact, and thus, the fact finder's determination regarding reasonableness "is binding on appeal unless plainly wrong." Wood v. Commonwealth, 57 Va. App. 286, 306 (2010) (quoting Emerson v. Commonwealth, 43 Va. App. 263, 277 (2004)).

Appellant asserts that the trial court erred in rejecting her reasonable hypothesis of innocence that she did not cause A.F. to fabricate the child abuse allegations because there was no direct evidence that she ever played the DD file for A.F., and there were significant

---

her father to appellant in the FaceTime recordings; thus, when she told police and CPS that A.F. had told her that her father touched her private area, that information was not false, as A.F. did in fact tell appellant this. Again, we find no merit in this argument based upon the trial court's finding that appellant utilized the "DD" file to cause A.F. to provide a fabricated report of child abuse. Because appellant knew that the report was false, it is immaterial that A.F. did in fact repeat the false allegation in the FaceTime recording.

differences between the DD file and A.F.'s forensic interview, showing that the "DD" file was not played for the child.[6]  However, we find, as above, that the trial court's finding that A.F. was "subjected to either the audio produced in DD or . . . some iteration of it that caused her to provide a fabricated version of abuse attributed to her father" was not plainly wrong.  Although A.F. provided more details in her forensic interview than were voiced by appellant in the "DD" file, it is reasonable to infer that appellant used the "DD" file *and* other methods to help A.F. provide a full account of the alleged child abuse to authorities.  Further, Detective Quint testified at trial as to the similarities between the "DD" file and A.F.'s forensic interview, noting that in the forensic interview "A.F. kept repeating, Daddy touches my private part . . . put his finger in my private part," and that these "keywords" were the "exact words" in both the "DD" file and the forensic interview.  The trial court, sitting as the fact finder, was entitled to reject the appellant's theory that she did not cause A.F. to fabricate the alleged child abuse because she had not played the "DD" file or some iteration of it for A.F.

### III.  CONCLUSION

We hold that trial court did not err in denying appellant's motions to strike.  Accordingly, we affirm the judgment of the trial court.

Affirmed.

---

[6] Appellant advances another, separate hypothesis of innocence on appeal—that A.F. made a disclosure of abuse to appellant prior to April 11, 2017, that appellant created the "DD" audio file to be used as a memory aid, and that appellant lied about the date on which A.F first made the disclosure, lying to authorities because appellant would have needed to wait to inform the authorities of the abuse until after the Maryland criminal charge was dropped on April 7, 2017.  Had she not waited, appellant contends, father would not have refused to testify.  However, "upon appellate review, the issue of exclusion of reasonable theories of innocence is limited to those theories advanced by the accused at trial.  Subject to the ends of justice exception, appellate courts will not entertain matters raised for the first time on appeal.  Rule 5A:18."  Hudson, 265 Va. at 514.  Appellant did not make this argument to the trial court, and we therefore will not consider that theory now on appeal.